# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| BRETT KANDELL, Derivatively on Behalf of Nominal Defendant, FXCM, Inc., | ) ) ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 11812-VCG |
| | ) |
| DROR NIV, WILLIAM AHDOUT, KENNETH GROSSMAN, DAVID SAKHAI, EDUARD YUSUPOV, JAMES G. BROWN, ROBIN DAVIS, PERRY FISH, ARTHUR GRUEN, ERIC LEGOFF, BRYAN REYHANI, and RYAN SILVERMAN, | ) ) ) ) ) ) ) ) |
| | ) |
| Defendants, | ) |
| and | ) |
| | ) |
| FXCM, INC., | ) |
| | ) |
| Nominal Defendant. | ) |

## MEMORANDUM OPINION

Date Submitted:  June 12, 2017
Date Decided:  September 29, 2017

Peter B. Andrews, Craig J. Springer, David M. Sborz, of ANDREWS & SPRINGER, LLC, Wilmington, Delaware; OF COUNSEL: Joseph E. White, III, Jorge A. Amador, Jonathan M. Stein, Adam Warden, of SAXENA WHITE, P.A., Boca Raton, Florida, *Attorneys for Plaintiff*.

Kenneth J. Nachbar, Thomas P. Will, of MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; OF COUNSEL: Paul R. Bessette, Israel Dahan, of KING & SPALDING LLP, New York, New York; Michael J. Biles, Tyler W. Highful, S. Saliya Subasinghe, of KING & SPALDING LLP, Austin, Texas, *Attorneys for Defendants and Nominal Defendant*.

GLASSCOCK, Vice Chancellor

This matter is before me on a Motion to Dismiss an action brought by a stockholder, purportedly derivatively for the benefit of his corporation, nominal defendant FXCM, Inc. ("FXCM" or "the Company"). FXCM is a foreign exchange ("FX") broker. The cause of action advanced is a suit against FXCM directors for losses associated with the so-called "Flash Crash" in the value of the euro relative to the Swiss franc, which happened when the Swiss unexpectedly decoupled the two currencies. As this Court has had numerous opportunities to explain, a chose in action is a corporate asset, subject, in our model, to the control of the corporation's directors. A stockholder who believes the asset is being poorly deployed must make a demand on the board; only if the board breaches its duty in response may the stockholder pursue the matter derivatively. The exception is where an impediment renders a majority of directors unable to bring their business judgment to bear on behalf of the corporation to consider the issue; in that case, demand is excused and the stockholder may litigate in the corporate interest. Under the facts here, the Plaintiff contends that demand is excused.

The bulk of the Company's business, at the time at issue, involved retail FX trades. With retail customers, FXCM employed an agency trading model under which the Company made, on customer order, offsetting currency trades in the FX market on behalf of the customer. That is, the Company made a purchase in the market, and made a corresponding sale to the customer. As is industry practice,

1

customers' trades were highly leveraged. Where the customer's position took a loss as a result of trading activity, it was FXCM's policy, in light of which it marketed its services, to retain the investment which the customer had paid, but not to pursue the customer for additional amounts owed FXCM; in other words, FXCM did the offsetting trades, the customer made an up-front and leveraged investment payment to FXCM, and any losses above that amount were retained by FXCM. FXCM sought to avoid such situations by selling out the customer's interest when losses beyond investment threatened. This it was generally able to do when the market was relatively stable and liquid.

FXCM's policy, however, entailed both business and regulatory risk. The business risk involved situations where the market became neither stable nor liquid; where customer's accounts were on the wrong side of such a market, FXCM could find itself liable for the large potential losses in excess of its customers' investments. Such a situation occurred when the euro lost value in the Flash Crash. FXCM suffered large losses, as a result of which it was required to borrow funds under onerous conditions, and in light of which the board took a number of actions. These losses and actions are the main focus of the Plaintiff's Complaint. Since I conclude that a majority of the directors were independent and disinterested, and because I find no likelihood that they face a substantial threat of liability for what were (costly) business decisions, I conclude that the Plaintiff has failed to demonstrate that the

directors' ability to exercise business judgment is impaired, and demand is not excused with respect to these allegations. The exception to this is the loan transaction itself, with respect to which a majority of the directors were not independent and disinterested: with respect to that transaction, demand is excused, and the Motion to Dismiss must be denied.

The more difficult issue here involves the legal and regulatory risk engendered by FXCM's business model. The Complaint points out that, at least since the time of the 2010 Dodd-Frank reforms, 17 C.F.R. § 5.16 ("Regulation 5.16") has prohibited FX traders from representing that they will limit clients' trading losses. According to the Plaintiff, that was exactly what FXCM was doing when it informed customers that, in certain circumstances, it would not pursue their losses beyond their initial investment. He notes that, during the pendency of this matter, the Commodity Futures Trading Commission ("CFTC") has brought an action alleging precisely that. The Defendants argue that the Plaintiff's reading is but one way to interpret the Regulation. They note that the Plaintiff has failed to allege that, up to the time pertinent, the CFTC had ever publicly taken a position that the model used by FXCM was in violation of Regulation 5.16, much less that the directors were aware of such. They point out that the Complaint is silent as to any "red flag," warning, or report to the directors suggesting that FXCM was not in compliance with the Regulation. The allegations of the Complaint are limited to these: First, the

3

directors were aware of Regulation 5.16, as demonstrated by the Company's Form 10-K disclosures, which, in each year pertinent, referenced Regulation 5.16. The Complaint notes that in these Form 10-Ks, the Company discloses as a risk that CFTC rules forbid making guarantees against loss to retail FX customers. Second, the directors were aware of the Company's advertised policy not to pursue customer losses beyond investment, a matter that the Defendants do not seriously contest. And third, that nonetheless the directors failed to ensure that the Company was brought into compliance with the Regulation.

Where directors knowingly cause or permit a Delaware corporation to violate positive law, they have acted in bad faith, and are liable to the corporation for resulting damages. Where, as here, the directors serve with the benefit of an exculpatory clause, they are *not* liable for non-compliance with law resulting from their negligence or gross negligence, however; only where they knowingly cause the violation, or knowingly ignore a duty to act, is bad faith in violation of the duty of loyalty invoked, leading to liability. Demand will be excused only where the facts alleged, together with reasonable inferences therefrom, if true make it substantially likely that any illegality on the part of the Company arose from the directors' bad faith.

Typically, directors are not charged with preventing illegal actions by company employees unless certain "red flags" make it inescapable that the board

4

acted with illegal intent, or in bad faith ignored a duty to act to prevent a violation. The pleading standard for such scienter on the part of directors is high. This case involves no notice to the Board by legal advisors that Company policy—soliciting customers by touting limited risk—was illegal, and the Complaint is silent regarding other such red flags. However, the Regulation itself is so clear on its face that, drawing the appropriate plaintiff-friendly inferences, I find it reasonably likely that the directors knowingly condoned illegal behavior. Of course, whether that high burden is substantively met awaits a developed record, and circumstances not apparent on the face of the pleadings may well show lack of bad faith. The question here, however, is whether this Board could bring its independent business judgment to bear on behalf of the corporate interest in responding to a liability demand. I find that the substantial likelihood of liability faced by the Defendants prevents such an exercise of business judgment, and demand on this cause of action is excused. A more detailed statement of the facts and my analysis follows.

# I. BACKGROUND[1]

### A. *The Parties*

Plaintiff Brett Kandell was a stockholder of nominal defendant FXCM, Inc. at all times relevant to this case and maintains his ownership interest today.[2] The Plaintiff seeks to bring this action derivatively on behalf of FXCM.[3] FXCM, a Delaware corporation, "is an online provider of foreign exchange trading and related services."[4]

Defendant Dror Niv has served as Chairman of the FXCM Board of Directors since 2010, when FXCM went public.[5] Beginning in 1999, Niv was also a director for FXCM's predecessor FXCM Holdings, LLC.[6] Niv was one of the founders of FXCM, and he has served as the Company's CEO since 1999.[7]

Defendants William Ahdout, Kenneth Grossman, David Sakhai, and Eduard Yusupov were also founding partners of FXCM.[8] Like Niv, these defendants have

---

[1] The facts, drawn from the Plaintiff's Verified Third Amended Shareholder Derivative Complaint ("Complaint" or "Third Amended Complaint"), from documents incorporated by reference therein, and from matters of which I may take judicial notice, are presumed true for purposes of evaluating the Defendants' Motion to Dismiss.

[2] Compl. ¶¶ 11, 159.

[3] *Id.* ¶ 158.

[4] *Id.* ¶ 12. On February 21, 2017, FXCM announced, among other things, that it would change its name to "Global Brokerage, Inc." Defs.' Resp. in Opp'n to Pl.'s Mot. for Leave to File a Supplement to the Compl. 9 n.2. Nonetheless, I refer to the Company as FXCM throughout this Memorandum Opinion, and I do not take note of other changes that have occurred at FXCM since the filing of the Plaintiff's Complaint.

[5] Compl. ¶ 13.

[6] *Id.*

[7] *Id.*

[8] *Id.* ¶¶ 14–17.

6

been members of FXCM's Board since 2010 and began serving on the Holdings Board in 1999.[9] Ahdout serves as "FXCM's Chief Dealer and is a Managing Director."[10] Grossman is also a Managing Director at FXCM.[11] Sakhai serves as FXCM's COO,[12] and Yusupov "is FXCM's Global Head of Dealing" in addition to serving as a Managing Director.[13]

Defendant James G. Brown has been a member of the FXCM Board since 2010 and began serving on the Holdings Board in 2008.[14] "Brown is the 'Presiding Independent Director' and is a member of the Board's Audit Committee, Compensation Committee, and Corporate Governance and Nominating Committee."[15] Defendant Robin Davis has served on the FXCM Board since 2010 and is a member of the Board's Audit Committee.[16] Defendant Arthur Gruen has been an FXCM Board member since 2010 and serves on the Audit and Compensation Committees.[17] Gruen is the founder and Vice President of Broker Online Exchange ("BOX"), a startup founded in 2013.[18] BOX "incurred net losses

---

[9] *Id.*
[10] *Id.* ¶ 14.
[11] *Id.* ¶ 15.
[12] *Id.* ¶ 16.
[13] *Id.* ¶ 17.
[14] *Id.* ¶ 18.
[15] *Id.*
[16] *Id.* ¶ 19.
[17] *Id.* ¶ 21.
[18] *Id.* ¶ 178(b).

of $17,498.00 and $25,542.53, in 2013 and 2014, respectively."[19] Defendants Eric LeGoff and Ryan Silverman have served on FXCM's Board since 2010.[20] Silverman chairs the Board's Corporate Governance and Nominating Committee, and he is the CEO of "MSR Solutions, Inc., a financial consulting firm."[21] The Complaint alleges on information and belief that "MSR Solution, Inc.'s annual revenue is $130,000."[22]

Defendant Perry Fish was a member of FXCM's Board from 2010 to February 1, 2016.[23] During that time, Fish chaired the Board's Compensation Committee and served on the Corporate Governance and Nominating Committee.[24] Fish worked as a lawyer "at the Law Offices of Perry Gary Fish" until 2014, and FXCM's 2015 annual proxy "does not indicate that Fish has been employed since 2014."[25] Defendant Bryan Reyhani has served on FXCM's Board since February 1, 2016.[26]

With the exception of Reyhani, all of these defendants signed FXCM's annual reports (filed on SEC Form 10-K) from fiscal year 2010 through fiscal year 2015.[27] FXCM's 2014 annual proxy revealed that Niv, Sakhai, Ahdout, Yusupov, and Grossman held "over 27.7% of the Company's voting power through their stock

---

[19] *Id.*
[20] *Id.* ¶¶ 22, 24.
[21] *Id.* ¶¶ 24, 178(c).
[22] *Id.* ¶ 178(c).
[23] *Id.* ¶ 20.
[24] *Id.*
[25] *Id.* ¶ 178(a).
[26] *Id.* ¶ 23.
[27] *Id.* ¶¶ 13–22, 24.

ownership."[28] According to the 2014 annual proxy, the Defendants collectively held 29.9% of FXCM's voting power, "making them the single largest group of FXCM shareholders."[29] And from fiscal year 2011 through fiscal year 2015, Gruen, Brown, Fish, LeGoff, Silverman, and David each received $150,000 in annual director compensation.[30]

*B. Factual Overview*

1. FXCM's Business Model

FXCM, which was founded in 1999 and went public in 2010, "provides online foreign exchange . . . trading services to nearly 200,000 customers globally."[31] FXCM's business is divided into two primary components: "retail trading, in which its customers are individual investors trading on their own personal accounts, and institutional trading, where the Company offers foreign exchange trading services to banks, hedge funds and other institutional customers."[32] FXCM obtains most of its profits from its retail segment, "with 76.6% of its 2014 trading revenues derived from retail and 23.4% from institutional customers."[33] Indeed, FXCM is the largest FX broker for retail customers in the United States.[34] Despite FXCM's prominence

---

[28] *Id.* ¶ 63.
[29] *Id.* ¶ 26.
[30] *Id.* ¶ 178.
[31] *Id.* ¶ 28.
[32] *Id.*
[33] *Id.*
[34] *Id.*

in the U.S. market, most of its "retail customer trading volume was derived from customers residing outside of the U.S., according to FXCM's . . . Form 10-K filed with the SEC on March 16, 2015."[35]

FXCM's trading platform employs what it describes as an "agency model" to carry out trades.[36] FXCM provided the following description of its agency model in its 2013 Form 10-K:

> Our agency model is fundamental to our core business philosophy because we believe that it aligns our interests with those of our customers and reduces our risks. In the agency model, when our customer executes a trade on the best price quotation offered by our FX market makers, we act as a credit intermediary, or riskless principal, simultaneously entering into offsetting trades with both the customer and the FX market maker. We earn trading fees and commissions by adding a markup to the price provided by the FX market makers.[37]

FXCM allows its customers to trade currency pairs, purchasing one currency at the same time as they sell another.[38] According to the Complaint, FXCM maintained a "policy of extending massive amounts of leverage to its customers,"[39] "with leverage of as much as 50:1 extended to U.S. customers and 200:1 for overseas customers."[40] FXCM's leverage policy stemmed from the nature of FX markets, in which "daily

---

[35] *Id.* ¶ 30.
[36] *Id.* ¶ 33.
[37] *Id.* (emphasis and footnote omitted).
[38] *Id.* ¶ 32.
[39] *Id.* ¶ 34.
[40] *Id.* ¶ 2.

10

currency fluctuations are usually very small."[41] Leverage therefore enables FX traders "to increase the value of potential currency movements."[42]

FXCM maintains several policies designed to reduce its customers' risk of incurring trading losses. It touts its "margin-watcher feature," which purports to "automatically close[] out open positions if a customer's account is at risk of going into a negative balance as a result of a trading position losing value and reaching the minimum margin threshold."[43] The Complaint notes that "market conditions" may prevent FXCM from closing out a customer's account before she is at risk of suffering losses greater than her margin.[44] When that happens, "FXCM's stated policy [as set out in the Company's Form 10-Ks] is 'generally not to pursue claims for negative equity against our customers.'"[45] In other words, where FXCM is unable to close out a customer account before its losses exceed the amount the customer invested, FXCM, and not the customer, takes the loss.

FXCM's policy regarding customer losses is embodied in its Client Agreement, which customers must sign before they open an account.[46] The Client Agreement provides, among other things, that "[if] the Client incurs a negative balance through trading activity, the Client should inform FXCM's trade audit team.

---

[41] *Id.* ¶ 30.
[42] *Id.*
[43] *Id.* ¶ 35.
[44] *Id.*
[45] *Id.*
[46] *Id.* ¶ 43.

11

FXCM will evaluate the inquiry and credit the Client's Account with the amount of the negative balance where the debit was due to trading activity."[47] The Client Agreement clarifies that this policy does not apply in various situations, including "in the case of a force majeure event," or where "FXCM determines, in its sole and absolute discretion, that the negative balance is unrelated to the Client's trading activity."[48]

The Complaint points to a bevy of FXCM materials designed to draw attention to the Company's policy regarding customer losses. In December 2014, FXCM's U.S. website stated that while "account equity" may "become[] negative," "FXCM will not hold traders responsible for deficit balances in this scenario."[49] And from March 2011 to March 2015, FXCM's U.S. website answered in the negative the following questions: "Is there a debit balance risk? Can I lose more money than I deposit?"[50] The site elaborated that FXCM "guarantee[s] you can never pay a debit balance. One of the greatest concerns traders have about leverage is that a sizable loss could result in owing money to their broker. At FXCM, your maximum risk of loss is limited by the amount in your account."[51] A July 6, 2010 FXCM Australia press release noted that "[u]nlike margin trading with other providers, FXCM

---

[47] *Id.*
[48] *Id.*
[49] *Id.* ¶ 47 (emphasis omitted).
[50] *Id.* ¶ 48 (emphasis omitted).
[51] *Id.* (emphasis omitted).

guarantees that you will never have to pay a deficit balance as a result of trading!"[52]

FXCM also used social media to promote its policy regarding customer losses. For example, on June 30, 2011, FXCM UK's Twitter page stated that "FXCM traders have peace of mind knowing that they are not responsible for account deficit balances as a result of trading."[53] And a now-removed YouTube video posted on FXCM's YouTube channel touted that "customers would 'NEVER OWE A DEFICIT AS A RESULT OF TRADING.'"[54]

### 2. CTFC Regulations and FXCM

The CFTC regulates FXCM.[55] The Complaint alleges in conclusory fashion that "[s]ince at least 1981, the CFTC has prohibited companies like FXCM from offering guarantees or limiting customer losses."[56] The Plaintiff, however, does not quote the language of this prohibition.[57] Instead, he points to Regulation 5.16, which the CFTC adopted in September 2010, as part of the Dodd-Frank reforms.[58] Under Regulation 5.16,

> a) No retail foreign exchange dealer, futures commission merchant or introducing broker may in any way represent that it will, with respect to any retail foreign exchange transaction in any account carried by a

---

[52] *Id.* ¶ 49.
[53] *Id.* ¶ 53.
[54] *Id.* ¶ 54.
[55] *Id.* ¶ 38.
[56] *Id.*
[57] It appears that the Plaintiff is referring to 17 C.F.R. § 1.56, which contains prohibitions similar to those found in Regulation 5.16.
[58] Compl. ¶ 38.

13

retail foreign exchange dealer or futures commission merchant for or on behalf of any person:

> (1) Guarantee such person against loss;
> (2) Limit the loss of such person; or
> (3) Not call for or attempt to collect security deposits, margin, or other deposits as established for retail forex customers.[59]

According to the CFTC, the purpose of adopting Regulation 5.16 was threefold. First, Regulation 5.16 provides protection for FX companies in the event of extreme volatility in the currency market.[60]  Second, Regulation 5.16 helps ensure that FX companies remain financially viable, because a firm that agrees to eat its customers' losses is at risk of undercapitalization, which may ultimately necessitate bankruptcy.[61]  Third, the CFTC was concerned that policies guaranteeing or limiting customer losses had often gone hand in hand with illegal conduct on the part of FX companies.[62]

FXCM's business model—"highly leveraged forex trading" combined with a policy that customers, typically, would not bear losses beyond what they deposited into their account—allegedly led to significant increases in the Company's retail trading volume.[63]  To support this assertion, the Plaintiff points out that "retail customer trading volume for December 2014 'was 61% higher than December

---

[59] 17 C.F.R. § 5.16.
[60] Compl. ¶ 39.
[61] *Id.* ¶ 40.
[62] *Id.* ¶ 41.
[63] *Id.* ¶ 44.

2013.'"[64] The Plaintiff charges that this business strategy, despite increasing profits for the Company, was premised on violations of Regulation 5.16. According to the Complaint, "the Individual Defendants ignored Regulation 5.16 in order to attract customers lured by the guarantee that they would never be financially responsible for a negative balance incurred on their account."[65]

The Complaint alleges that the Defendants "could not help but know about FXCM's violations of Regulation 5.16 due to its scope and pervasiveness at the Company."[66] Specifically, the Complaint asserts that because "Regulation 5.16 was part of a significant overhaul of the CFTC's regulations in connection with the highly publicized Dodd-Frank Act in 2010, the Company's Board knew or should have known that the Company's zero debit policy was a violation of Regulation 5.16."[67] The Complaint also alleges that the Defendants were aware of FXCM's purported violations of Regulation 5.16 because of the Company's "extensive marketing materials and its client agreements offering guarantees to customers."[68] Finally, the Complaint attempts to establish the Defendants' knowledge of impropriety by pointing to FXCM's SEC filings, which refer to Regulation 5.16.[69] For instance, FXCM's Form 10-Ks for 2010 to 2014 noted that one of the risks

---

[64] *Id.*
[65] *Id.* ¶ 43.
[66] *Id.* ¶ 45.
[67] *Id.*
[68] *Id.* ¶ 46.
[69] *Id.* ¶ 55.

15

facing the Company involved the CFTC's adoption of "final rules which, among other things, 'prohibit the making of guarantees against loss to retail FX customers.'"[70]

On August 18, 2016, the CFTC brought a complaint against FXCM, alleging that it had "improperly guarantee[d] its customers against loss, limit[ed] the loss of customers, or not call[ed] for or attempt[ed] to collect security deposits, margin, or other deposits of customers."[71] "The CFTC . . . [sought] damages in the billions of dollars as a result of FXCM's violations of Regulation 5.16."[72] In February 2017, FXCM entered into a consent order with the CFTC in which it agreed to pay a $650,000 fine for, among other things, violations of Regulation 5.16 resulting from its no-debit policy.[73] FXCM did not admit or deny the consent order's allegations or conclusions,[74] and the order provides scant factual detail regarding the Company's implementation of the no-debit policy. It states that "FXCM represented to customers that it would limit customer losses . . . . by advertising that if the customer incurred a negative balance through trading activity FXCM would credit the customer account with the amount of the negative balance."[75] The consent order

---

[70] *Id.* The Plaintiff alleges that Niv wrote several letters to the CFTC in 2010 in opposition to some of the proposed regulations. *Id.* ¶ 45. But the Plaintiff does not assert that any of these letters referred to Regulation 5.16.

[71] *Id.* ¶ 58.

[72] *Id.*

[73] Consent Order ¶¶ 37–38, 40.

[74] *Id.* ¶ 11.

[75] *Id.* ¶ 31.

also notes that the no-debit policy "was memorialized in FXCM's customer account opening documents."[76]

### 3. The "Flash Crash"

From September 2011 to January 15, 2015, the Swiss National Bank ("SNB") maintained a policy of pegging the Swiss franc to the euro.[77] During this time, the SNB worked to prevent the Swiss franc from "appreciat[ing] beyond the level of 1.2 euros per franc."[78] The SNB adopted this policy "during the Eurozone debt crisis . . ., when, in response to a weakening euro and fears of the euro's ongoing viability as a common currency, an influx of money flowed into Switzerland, creating upward pressure on the Swiss franc."[79] The introduction of this currency peg caused what the Complaint describes as "the largest price swing of any 'G-10' currency in recent memory (other than when the peg was removed on January 15, 2015), with the Swiss franc falling 8.8% against the euro on the day of the announcement."[80] Nevertheless, as a result of the SNB's efforts, the EUR/CHF currency pair remained stable for several years, and FX traders took "large positions in the pair."[81] FXCM, for its part, promoted trading in the EUR/CHF pair through a Company-owned website and

---

[76] *Id.*
[77] Compl. ¶¶ 65, 68.
[78] *Id.* ¶ 65.
[79] *Id.*
[80] *Id.*
[81] *Id.* ¶ 66.

online videos.[82]  At least two of FXCM's competitors—Gain Capital Group and Saxo Bank—saw a potential downside in the growth of trading positions that were long on EUR and short on CHF.[83]  As a result, these two companies "increased their margin requirements for the pair."[84]  FXCM, however, took no such precautionary measures.[85]

In response to concerns that the European Central Bank was about to "creat[e] downward pressure on the euro" via "pumping in money through bond purchases," the SNB "announced on January 15, 2015 that it would allow its currency to float freely against the euro."[86]  The announcement led to extreme volatility in the EUR/CHF currency pair, with the Swiss franc appreciating rapidly.[87]  The franc rose "more than 41% against the euro, eventually settling at an 18% rise *over the course of the day*."[88]  As a result of this volatility, FX markets were drained of liquidity, effectively preventing FXCM from executing stop orders or margin calls until approximately forty-five minutes after the announcement.[89]  But "[b]y that time, customers on the wrong side of the EUR/CHF pair [that is, long on EUR, short on

---

[82] *Id.*
[83] *Id.* ¶ 67.
[84] *Id.*
[85] *Id.*
[86] *Id.* ¶ 68.
[87] *Id.* ¶ 69.
[88] *Id.* (emphasis added).
[89] *Id.*

CHF] had locked in significant losses."[90]  Many of these customers incurred negative

account balances, and their losses were compounded by their reliance on leverage in

their trading strategies.[91]

The Flash Crash proved catastrophic for FXCM.  On the evening of January

15, FXCM put out a press release announcing that FXCM's customers had suffered

large losses, leading to "negative equity balances owed to FXCM of approximately

$225 million," a figure later revised upward to $276 million.[92]  FXCM also stated

that these negative balances potentially put it "in breach of certain regulatory capital

requirements."[93]  FXCM was hampered in its ability to collect on these accounts

because of its policy regarding customer losses, which put "the Company . . . on the

hook for these losses."[94]  The Complaint describes in great detail the FXCM Board's

response to these events, to which I now turn.

4. The Board's Response to the Flash Crash

The FXCM board first met to address the Flash Crash at 3:00 pm on January

15, 2015.[95]  Niv gave background on the events of the day, and noted that FXCM

customers had suffered $200 million in losses that the Company may not be able to

---

[90] *Id.*
[91] *Id.*
[92] *Id.* ¶ 71 n.37.
[93] *Id.* ¶ 71.
[94] *Id.* ¶ 2.
[95] *Id.* ¶ 79.

collect.[96]  Niv also pointed out that FXCM might be breaching its revolving credit agreement, so that the Company "had to raise a total of at least $250 million."[97] According to Niv, FXCM's regulators "threatened a 'temporary' suspension of the Company's operations if sufficient funds were not raised by the next morning."[98] Niv told the Board that, to address this crisis, FXCM had sought the services of UBS, which "only advised FXCM in its capacity as placement agent in exploring financing alternatives, and did not advise the Company on debt financing."[99]  Niv also suggested that "as a backup plan," FXCM could obtain capital from its competitors.[100]

The FXCM board met again on the evening of January 15.[101]  Niv gave an update on the situation, describing UBS's ongoing efforts to obtain financing for the Company.[102]  Niv mentioned that Jeffries Group LLC, "an investment banking subsidiary of the holding company Leucadia," was in FXCM's offices and was considering providing financing to the Company.[103]  At this meeting, Niv stated that a suspension of trading "would not necessarily put the Company out of business but

---

[96] *Id.*
[97] *Id.*
[98] *Id.* ¶ 82.
[99] *Id.* ¶ 81.
[100] *Id.*
[101] *Id.* ¶ 84.
[102] *Id.*
[103] *Id.*

could cause a dramatic reduction in the value of the Company."[104]   The Plaintiff emphasizes that, while the Board received updates and information from Niv about the situation and potential next steps, the Board did not obtain "a financial advisor to counsel the directors on issues that were essential to the Company's very existence as a going concern."[105]   Specifically, neither UBS nor any other investment bank provided advice as to debt financing or the loan FXCM eventually obtained from Leucadia.[106]

The next morning, at 8:30 am, the Board convened for a third time.[107]   Niv informed the Board that "regulators from the CFTC and the [National Futures Association] were in the Company's offices and had threatened to shut down the Company's operations if FXCM did not immediately receive sufficient capital to stay in regulatory compliance."[108]   Robert Lande, FXCM's CFO, mentioned that the Company was working on a deal with Leucadia in which "Leucadia would extend a two year secured loan of up to $300 million . . . to FXCM, with an interest rate of 10%, increasing 1% per quarter."[109]   At this time, FXCM had contacted several other parties, but none "were willing to execute a transaction within the time frame

---

[104] *Id.* ¶ 85.
[105] *Id.*
[106] *Id.* ¶ 168.
[107] *Id.* ¶ 86.
[108] *Id.*
[109] *Id.*

demanded by the regulators."[110] Niv reiterated his view that a shutdown would wipe out FXCM's enterprise value, but that "some value could be preserved in a transaction prior to a shutdown."[111]

The Board met yet again at 11:15 am, and the directors learned that the regulators would force the Company into liquidation if it did not obtain enough capital to bring it into regulatory compliance by noon.[112] Niv then told the Board that the loan offered by Leucadia was FXCM's only option if it was to continue to operate.[113] The Complaint alleges that while UBS had been unable to secure *equity* financing from other parties with whom it or the Company had negotiated, "UBS and the Company failed to propose a loan from these parties similar to the Leucadia Loan, but with better terms for the Company."[114]

At this meeting, Niv also set out the terms of the proposed Leucadia deal.[115] In exchange for loaning FXCM $300 million, Leucadia would receive interest at the rate of 10% per annum, increasing by 1.5% every quarter.[116] The loan was set to mature in two years, and after repayment, "net proceeds of asset sales, as well as certain other distributions from the operating subsidiaries, would be split, with the

---

[110] *Id.* ¶ 87.
[111] *Id.* ¶ 88.
[112] *Id.* ¶ 89.
[113] *Id.*
[114] *Id.*
[115] *Id.* ¶ 90.
[116] *Id.*

Company receiving 25% and Jefferies/Leucadia receiving 75%."[117]  Further, after three calendar years, Leucadia could force a sale of the Company.[118]  After Niv explained these terms, Brown, the "Presiding Independent Director" of FXCM, said he was interested in "personally participating in the transaction."[119]  Niv then stated his belief that FXCM would likely enter receivership if the Board did not approve the loan from Leucadia, "and that this would be a worse option for shareholders, as customers would lose money (because not all customer funds are segregated) and there would be substantial litigation and potential governmental issues."[120]  The Plaintiff downplays the urgency of the situation facing the Board, pointing to CFTC Regulation 5.7, which gives companies a ten-day extension if they can demonstrate that they are able to comply with capital requirements.[121]  According to the Complaint, the Board never sought an extension under Regulation 5.7, though the Plaintiff admits that Niv informed the directors of his view that the regulators would not give the Company additional time to explore alternative transactions.[122]  All the directors (save Brown, who abstained) voted to approve the Leucadia deal.[123]

---

[117] *Id.*
[118] *Id.*
[119] *Id.* ¶ 91.
[120] *Id.* ¶ 92.
[121] *Id.*
[122] *Id.* ¶ 92 n.41.
[123] *Id.* ¶ 93.

Shortly after the preliminary vote, it emerged that Steven Cohen Asset Management ("SACAM") was interested in offering a more advantageous deal to FXCM than that proposed by Leucadia.[124] But this deal later fell through because Steven Cohen, SACAM's head, could not obtain from the regulators "certain assurances he was seeking due to prior regulatory violations by his firm."[125]

The final board meeting in the immediate aftermath of the Flash Crash took place approximately four hours later.[126] At 3:05 pm, right before the Board was set to approve the Leucadia loan, CFTC regulators entered the room and announced that "if the Board did not approve the transaction at that very moment, they would shut down the Company's operations immediately and force FXCM into liquidation."[127] The Board (again with the exception of the abstaining Brown) then approved the transaction.[128] Despite the compressed timeframe within which the Board was forced to act, the Plaintiff faults the Board for failing to form "a special committee of independent directors to cleanse the process of conflicts of interest."[129] As an example of such a conflict of interest, the Plaintiff points out that five out of eleven

---

[124] *Id.*
[125] *Id.*
[126] *Id.* ¶ 94.
[127] *Id.*
[128] *Id.*
[129] *Id.* ¶ 95.

FXCM board members were insiders who were "not listed as 'independent' in the Company's annual proxies."[130]

### 5. The Aftermath

On January 19, 2015, FXCM issued a press release announcing the Leucadia loan.[131] It described the terms of the loan, which included, as noted above, an initial interest rate of 10% per annum that would increase by 1.5% each quarter the loan remained outstanding until the cap of 20.5% was reached, and an agreement that FXCM would pay Leucadia a share of the proceeds resulting from certain transactions, including a sale of assets, dividends or distributions, and the sale of the Company.[132] Under this value-sharing agreement, once the Leucadia loan and associated fees were paid off, Leucadia would be entitled to 50% of the next $350 million of sale proceeds, dividends, or distributions, 90% of the "[n]ext amount equal to 2 times the balance outstanding on the term loan and fees as of April 16, 2015, such amount not to be less than $500 million or more than $680 million," and 60% of "[a]ll aggregate amounts thereafter."[133] The loan also contained several restrictive covenants limiting FXCM's ability to enter mergers and other significant

---

[130] *Id.*
[131] *Id.* ¶ 97.
[132] *Id.*
[133] *Id.*

transactions.[134]  And, as discussed above, Leucadia held the right to force a sale of FXCM after three years.[135]

According to the Complaint, market reaction to the Leucadia deal was negative.  The Plaintiff points out that on January 15, 2015, FXCM stock closed at $12.63, and when trading in the stock began again on January 20, FXCM stock opened at $1.58 and closed at $1.60.[136]  The Complaint also quotes financial analysts who expressed the view that the Leucadia loan had significantly reduced the value of FXCM stock.[137]  As a result of FXCM's inability to pay down the Leucadia loan with revenue from its businesses, the Company has had to sell several of its subsidiaries.[138]  Another consequence of the Flash Crash was that FXCM "increased margin requirements for global clients who trade currencies."[139]  FXCM also stopped allowing customers to trade fourteen currency pairs that it deemed too risky.[140]

FXCM implemented several other changes in the wake of the Flash Crash and the Leucadia loan.  On January 30, 2015, "the Board announced that it had adopted a Stockholder Rights Plan ["Rights Plan"] . . . , declaring a dividend distribution of

---

[134] *Id.*
[135] *Id.*
[136] *Id.* ¶ 99.
[137] *Id.* ¶¶ 101–03.
[138] *Id.* ¶ 104.
[139] *Id.* ¶ 106.
[140] *Id.*

one right on each outstanding share of the Company's Class A common stock."[141]

The Rights Plan had a 10% ownership trigger, and when UBS made a presentation to FXCM on the Plan, it noted that "only 19% of rights plans then in-effect by S&P 600 companies employed ownership triggers of less than 15%."[142] FXCM's press release announcing the Plan stated that it was "designed to reduce the likelihood that any person or group would gain control of the Company by open market accumulation or other coercive takeover tactics without paying a control premium for all shares."[143] Approximately one year later, FXCM amended the Rights Plan to lower the ownership trigger to 4.9%.[144] According to the Complaint, FXCM adopted and amended the Rights Plan even though the Company "had neither a history of contentious shareholder activism nor any implicit threat of action by outside activist investors."[145]

In March 2015, FXCM announced that Niv, Sakhai, Adhout, and Yusupov had entered into new severance agreements with the Company.[146] If these executives were fired, they "would be entitled to[, among other things,] (1) two times their annual base salary on the termination date, [and] (2) their annual target bonus (which

---

[141] *Id.* ¶ 107.
[142] *Id.* ¶ 109 n.48.
[143] *Id.* ¶ 107.
[144] *Id.* ¶ 110.
[145] *Id.* ¶ 111.
[146] *Id.* ¶ 113.

is 200% of the executive's annual base salary)."[147]  Each of these executives received an annual base salary of $800,000.[148]  Under their previous severance agreements, they were entitled only to twice their base salary, so that the new agreements "add[ed] an additional $1.6 million (double their annual base salary) to each executive's severance package."[149]  Moreover, Niv, Sakhai, Adhout, Yusupov, and Lande (FXCM's CFO) received yearly incentive bonus plans tied to "EBITDA growth, repayments of the Leucadia Loan, and an 'Individual Objective Portion.'"[150]  The result of this new incentive plan was that Niv, Sakhai, Ahdout, and Yusupov saw their compensation more than double between 2014 and 2015.[151]  The Plaintiff takes issue with the decision to tie bonuses to repayment of the Leucadia loan, describing it as a way of "accomplishing a goal that was already contractually mandated."[152]  The Plaintiff also attacks Niv's compensation in 2015, alleging that he "is the second highest paid CEO in his peer group . . . despite FXCM having the lowest market capitalization, fifth lowest total assets, third lowest total revenues, and the worst earnings in its peer group."[153]

---

[147] *Id.*
[148] *Id.*
[149] *Id.* ¶ 115 (emphasis omitted).
[150] *Id.* ¶ 117.
[151] *Id.*
[152] *Id.* ¶ 118.
[153] *Id.* ¶ 121.

In April 2016, FXCM amended the bonus plans to remove the Leucadia loan component of the bonus calculation and increase the EBITDA portion.[154] The amendment also "reduce[d] the 2016 EBITDA target from $80.5 million to $40 million—more than a 50% decrease despite a 100% increase in its weighted significance for the bonus calculation."[155] The Plaintiff alleges that the Board enacted this amendment because it would enhance these executives' ability to obtain bonuses.[156] To support this allegation, the Plaintiff points out that while "FXCM's adjusted EBITDA in 2013 was approximately $158 million and in 2014 was approximately $107 million, under the amended Annual Incentive Bonus Plan the adjusted EBITDA target for 2015 is only $70 million, and in 2016 is only $40 million."[157]

On March 10, 2016, FXCM announced that it had entered a memorandum of understanding ("MOU") with Leucadia to amend the Leucadia loan.[158] The Plaintiff emphasizes that in exchange for giving FXCM an additional year to pay off the loan, "Leucadia will acquire 49.9% common membership interest in the newly named FXCM Group."[159] The MOU also modified the value-sharing schedule discussed above; now, FXCM management is "guaranteed between 10% and 14% of the post-

---

[154] *Id.* ¶ 123.
[155] *Id.*
[156] *Id.* ¶ 124.
[157] *Id.*
[158] *Id.* ¶ 126.
[159] *Id.* ¶ 128.

loan proceeds."[160]  More specifically, after the Leucadia loan is paid off, "FXCM senior management will be entitled to receive $35 million of the first $350 million in proceeds, $60 million of the next $500 million in proceeds, and 14% of the Company's proceeds for the indefinite future."[161]  While "[t]he amendments were expected to be completed by June 2016, . . . to date the MOU has not been finalized."[162]

## C. This Litigation

The Plaintiff filed his initial complaint on December 15, 2015, and filed an amended complaint on March 4, 2016.  After the Plaintiff filed another amended complaint on May 31, 2016, the Defendants moved to dismiss, whereupon the Plaintiff filed the Complaint currently before the Court.  The Complaint asserts six counts against the Defendants.  Count I alleges that the Defendants breached their fiduciary duties of loyalty and care by allowing the Company to violate Regulation 5.16; approving the Leucadia loan, the severance agreements and bonus plans, and the Rights Plan; failing to obtain the services of a financial advisor to opine on the merits of the Leucadia loan or other debt financing options; and exposing the Company to undue risk.[163]  Count II is brought against the insider defendants (Niv,

---

[160] *Id.* ¶ 129.
[161] *Id.* ¶ 131.
[162] *Id.* ¶ 126.
[163] *Id.* ¶¶ 192–96.

Sakhai, Adhout, Yusupov, and Grossman) for breaching their fiduciary duties by "caus[ing] the Company to enter into the Leucadia Loan and the MOU, despite the fact that the terms of the Leucadia Loan were grossly unfair to the Company."[164] Count III seeks indemnification and contribution from the Defendants in the event that FXCM is found liable for conduct for which the Defendants are responsible.[165] Counts IV and V allege that the Leucadia loan, the severance agreements and bonus plans, and the MOU constituted a waste of corporate assets.[166] Finally, Count VI asserts that Niv, Sakhai, Adhout, and Yusupov were unjustly enriched as a result of the severance agreements and bonus plans.[167] As noted above, the Plaintiff seeks to proceed derivatively on behalf of FXCM.[168] The Plaintiff chose not to make a pre-suit demand on the FXCM board, arguing that such demand would be futile.[169]

The Defendants moved to dismiss the Complaint on October 17, 2016, and on December 1, 2016, the Plaintiff moved to strike various materials relied on in the Defendants' motion papers. I heard oral argument on these motions on February 1, 2017. On February 13, 2017, the Plaintiff moved to file a supplement to his Complaint based on a recent CFTC Order ("February CFTC Order") that, among other things, fined FXCM for failing to disclose that it retained a financial interest

---

[164] *Id.* ¶ 203.
[165] *Id.* ¶¶ 208–09.
[166] *Id.* ¶¶ 213–14, 219–20.
[167] *Id.* ¶ 224.
[168] *Id.* ¶ 158.
[169] *Id.* ¶ 161.

in a market maker with which FXCM's customers often traded.[170]  I heard oral argument on that motion on May 17, 2017.  After the parties indicated to me that no further argument was needed, I considered the matter fully submitted on June 12, 2017.  This Memorandum Opinion addresses the pending motions.[171]  I turn first to the Motion to Dismiss.

## II. ANALYSIS

### A. The Motion to Dismiss

The Defendants have moved to dismiss the Plaintiff's Complaint under Court of Chancery Rule 23.1 for failure to make a demand.[172]  The demand requirement is an extension of the bedrock principle that "directors, rather than shareholders, manage the business and affairs of the corporation."[173]  Directors' control over a corporation embraces the disposition of its assets, including its choses in action.  Thus, under Rule 23.1, a derivative plaintiff must "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain

---

[170] More specifically, the CFTC announced that it intended to institute proceedings against FXCM for the conduct just described, and before those proceedings began, FXCM agreed to, among other things, pay a $7 million fine, stop violating the relevant laws, and withdraw from CFTC registration.  Feb. CFTC Order 1, 12–14.  FXCM neither admitted nor denied the Order's allegations or conclusions. *Id.* at 1.

[171] Because I do not rely on any of the materials submitted by the Defendants to which the Plaintiff objects, I need not decide the Plaintiff's Motion to Strike.

[172] The Plaintiff has also moved to dismiss under Court of Chancery Rule 12(b)(6).

[173] *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984) (citing 8 *Del. C.* § 141(a)).

the action or for not making the effort."[174]  Where, as here, the plaintiff has failed to make a pre-suit demand on the board, the Court must dismiss the complaint "unless it alleges particularized facts showing that demand would have been futile."[175]  The plaintiff's "pleadings must comply with stringent requirements of factual particularity that differ substantially from the permissive notice pleadings governed solely by Chancery Rule 8(a)."[176]

This Court analyzes demand futility under the test set out in *Rales v. Blasband*.[177]  *Rales* requires a derivative plaintiff to allege particularized facts raising a reasonable doubt that, if a demand had been made, "the board of directors could have properly exercised its independent and disinterested business judgment in responding to [it]."[178]  *Aronson v. Lewis* addresses the subset of cases in which the plaintiff is challenging an action taken by the current board.[179]  To establish demand futility under *Aronson*, the plaintiff must allege particularized facts creating a reasonable doubt that "the directors are disinterested and independent" or the "challenged transaction was otherwise the product of a valid exercise of business

---

[174] Ct. Ch. R. 23.1(a).
[175] *Ryan v. Gursahaney*, 2015 WL 1915911, at *5 (Del. Ch. Apr. 28, 2015), *aff'd*, 128 A.3d 991 (Table) (Del. 2015).
[176] *Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000).
[177] 634 A.2d 927 (Del. 1993).
[178] *Id.* at 934.
[179] *See id.* at 933–34 (explaining that *Aronson* does not apply unless the plaintiff is challenging a business decision by the board of directors that would be considering the demand).

judgment."[180]   The tests articulated in *Aronson* and *Rales* are "complementary versions of the same inquiry."[181]   That inquiry asks whether the board is capable of exercising its business judgment in considering a demand.[182]   "Courts assess demand futility on a claim-by-claim basis."[183]

### 1. The Leucadia Loan and the MOU

Because the Plaintiff first challenged the Board's decision to approve the Leucadia loan in his original complaint, I must consider whether demand would have been futile with respect to the Board as it was constituted when the initial complaint was filed—that is, when it was composed of the same directors who approved the Leucadia loan.[184]   At that time, eleven directors sat on FXCM's Board: Niv, Ahdout, Grossman, Sakhai, Yusupov, Brown, Davis, Fish, Gruen, LeGoff, and Silverman.[185] Of those eleven, Niv, Ahdout, Grossman, Sakhai and Yusupov were corporate officers as well as directors.[186]   The Defendants do not argue that these Company

[180] 473 A.2d at 814.

[181] *In re China Agritech, Inc. S'holder Derivative Litig.*, 2013 WL 2181514, at *16 (Del. Ch. May 21, 2013); *see also David B. Shaev Profit Sharing Account v. Armstrong*, 2006 WL 391931, at *4 (Del. Ch. Feb. 13, 2006) ("This court has held in the past that the *Rales* test, in reality, folds the two-pronged Aronson test into one broader examination.").

[182] *In re Duke Energy Corp. Derivative Litig.*, 2016 WL 4543788, at *14 (Del. Ch. Aug. 31, 2016).

[183] *Reiter ex rel. Capital One Fin. Corp. v. Fairbank*, 2016 WL 6081823, at *6 (Del. Ch. Oct. 18, 2016).

[184] *See Rales*, 634 A.2d at 934 (instructing courts to consider "whether *the board that would be addressing the demand* can impartially consider its merits without being influenced by improper considerations" (emphasis added)).

[185] Pl.'s Verified Shareholder Derivative Compl. ¶¶ 12–22.

[186] Compl. ¶¶ 61–62.

employees were disinterested with respect to the Leucadia loan transaction,[187] and I assume for purposes of this pleadings-stage analysis that they were not. Brown, Davis, Fish, Gruen, LeGoff, and Silverman were outside directors,[188] and they made up a majority of the Board. The Plaintiff argues that the outside directors were not independent with regard to the Leucadia loan because their approval of the loan enabled them to retain their board positions and the compensation associated with those positions. The Defendants vigorously dispute this proposition. I address the Plaintiff's entrenchment arguments below with respect to other claims advanced in the Complaint. With respect to the Leucadia loan transaction, however, the issue is irrelevant, because in any event, a majority of the directors who approved the transaction cannot be considered disinterested.

That is because, when presented with the proposed Leucadia loan, one of the outside directors, Brown, expressed to the Board his intention, or wish, to become involved in the transaction *from the lender's side*.[189] The Complaint is silent as to whether he ultimately was a part of the Leucadia loan. Decisively here, however, in apparent recognition that he was conflicted, he abstained from the vote.[190] This left,

---

[187] *See, e.g.*, Defs.' Opening Br. 25 (arguing that, with respect to the Leucadia loan, "[t]here can be no dispute that a majority of these eleven directors—Brown, Davis, Fish, Gruen, LeGoff and Silverman—were independent, outside directors with no personal financial stake in the [transaction]").

[188] Pl.'s Verified Shareholder Derivative Compl. ¶ 2.

[189] Compl. ¶ 91.

[190] *Id.* ¶¶ 93–94.

with respect to the Leucadia transaction, an effective ten-member board. With respect to at least five of those members, the Defendants do not contend that they can be considered disinterested for purposes of this motion. Under *Aronson*, then, demand is excused. Since the facts alleged indicate that the transaction was not approved by a Board with a majority of disinterested and independent directors, it is reasonably likely that entire fairness review will apply here.[191] In that situation, the Board would be unable to effectively bring its independent judgment to bear on a litigation demand, and demand is therefore excused.

Because demand is excused, I must consider the alternative ground for the Defendants' Motion, dismissal under Rule 12(b)(6). Under that rule, a motion to dismiss must be denied unless, accepting as true the well-pled[192] facts and the reasonable inferences therefrom, it nonetheless is not reasonably conceivable that the Plaintiff can prevail.[193] The Defendants argue that the Board was faced with the Leucadia loan decision when the only alternative was corporate ruin; they describe

---

[191] *See, e.g.*, *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 44 (Del. Ch. 2013) ("To obtain review under the entire fairness test, the stockholder plaintiff must prove that there were not enough independent and disinterested individuals among the directors making the challenged decision to comprise a board majority.").

[192] I am well aware that pedants prefer "well-pleaded" to "well-pled." This Court's Webster's Twentieth Century Dictionary (1964) describes "pled" as "colloquial or dialectal." My personal Webster's Third New International Dictionary (2002), on the other hand, allows it as a standard alternative to the preferred "pleaded." The Oxford English Dictionary describes "pled" as an Americanism, which I suppose is good enough for me. In any event, I was raised with "pled"; if my continued use of the term outs me as a mumpsimus, so be it.

[193] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 27 A.3d 531, 535 (Del. 2011).

the vote as existential with respect to the Company. It may prove so, but I have found it reasonably conceivable that entire fairness review is invoked here. Under that standard of review, it is appropriate that I examine the transaction with a full record.[194] The Motion to Dismiss under Rules 23.1 and 12(b)(6) is accordingly denied with respect to the Leucadia transaction.

The Plaintiff also alleges that a breach of duty inheres in Board approval of the MOU to modify the Leucadia loan. The Complaint is silent as to whether Brown voted for or abstained from the vote to approve the MOU. In light of my decision on the Leucadia loan, I find it prudent to deny the Motion to Dismiss with respect to the MOU pending discovery as well.

### 2. The Rights Plan

The Plaintiff also attacks the Board's decision to approve (and later amend) the Rights Plan in the aftermath of the Flash Crash. As with the Leucadia loan, the Plaintiff first challenged the adoption of the Rights Plan in his initial complaint, at which time the Board consisted of Niv, Ahdout, Grossman, Sakhai, Yusupov, Brown, Davis, Fish, Gruen, LeGoff, and Silverman. Again, of those individuals, Brown, Davis, Fish, Gruen, LeGoff, and Silverman were outside directors who constituted a majority of the Board. The Plaintiff argues that demand is excused as

---

[194] *See Williams v. Ji*, 2017 WL 2799156, at *5 (Del. Ch. June 28, 2017) ("The entire fairness standard of review 'normally will preclude dismissal of a complaint on a Rule 12(b)(6) motion to dismiss.'" (quoting *Orman v. Cullman*, 794 A.2d 5, 20 n.36 (Del. Ch. 2002))).

to the Rights Plan under *Aronson*'s first prong because the outside directors approved the Rights Plan to entrench themselves.

To excuse demand as to a stockholder rights plan under the first *Aronson* prong, a plaintiff "must plead particularized facts demonstrating that the directors had either a financial interest or an entrenchment motive in [adopting] the Rights Plan."[195] But "a conclusory allegation of entrenchment . . . will not suffice to excuse demand."[196] And if the allegedly entrenching transaction "could, at least as easily, serve a valid corporate purpose as an improper purpose, such as entrenchment," then demand will not be excused.[197] Moreover, "a board need not be faced with a specific threat before adopting a rights plan."[198]

Here, the FXCM Board adopted the Rights Plan in the aftermath of the Flash Crash, when FXCM stock had declined by *87%*. The Rights Plan initially had what the Complaint describes as an "atypically low" 10% ownership trigger,[199] which was later reduced to 4.9%. The Plaintiff attempts to demonstrate an entrenchment motive with respect to the Rights Plan by alleging that "the Board adopted the Rights Plan simply to maintain their stronghold over the Company and keep the Company's shareholders at bay."[200] The result of the Rights Plan, according to the Plaintiff, is

---

[195] *In re Chrysler Corp. S'holders Litig.*, 1992 WL 181024, at *4 (Del. Ch. July 27, 1992).
[196] *Cottle v. Standard Brands Paint Co.*, 1990 WL 34824, at *8 (Del. Ch. Mar. 22, 1990).
[197] *Id.*
[198] *Nomad Acquisition Corp. v. Damon Corp.*, 1988 WL 383667, at *5 (Del. Ch. Sept. 20, 1988).
[199] Compl. ¶ 109.
[200] *Id.* ¶ 111.

that "FXCM's shareholders have effectively lost their ability to oppose management or influence corporate policy through an established proxy process because the Rights Plan creates an unreasonable and intentional barrier to prevent shareholders from acquiring meaningful ownership stakes in the Company."[201] The Plaintiff also stresses that FXCM had "neither a history of contentious shareholder activism nor any implicit threat of action by outside activist investors."[202] These allegations do not suffice to excuse demand under *Aronson*'s first prong.

For starters, the Plaintiff fails to allege any particularized facts suggesting that the Board was motivated to entrench itself in adopting and later amending the Rights Plan. It is not enough to offer, as the Plaintiff does here, the conclusory allegation that "[i]n reality, the Rights Plan was designed to further entrench FXCM's Board and management in office by blocking any takeover efforts from third parties."[203] That is because, as noted above, "a conclusory allegation of entrenchment . . . will not suffice to excuse demand."[204] And while FXCM was not faced with a takeover threat from any particular party, that alone is not enough to successfully allege an entrenchment motive.[205] Given the precipitous decline in FXCM's share price in the wake of the Flash Crash—which could conceivably subject the Company to takeover

[201] *Id.*
[202] *Id.*
[203] *Id.* ¶ 108.
[204] *Cottle*, 1990 WL 34824, at *8.
[205] *See Nomad Acquisition Corp.*, 1988 WL 383667, at *5 ("[A] board need not be faced with a specific threat before adopting a rights plan.").

bids that did not capture the Company's full value—it is clear from the Complaint that the Board's adoption of the Rights Plan "could, at least as easily, serve a valid corporate purpose as an improper purpose, such as entrenchment."[206]  Furthermore, that FXCM had never previously faced serious threats from activist stockholders or outside activist investors does not imply that the Board lacked a legitimate business purpose for adopting and amending the Rights Plan at issue here.  Finally, I note that no accumulation of shares is alleged and no request to waive the Plan has been presented to, let alone declined by, the Board.  Such circumstances, should they occur, may invoke equitable relief not available here, in a figurative vacuum.  The Plaintiff cannot allege any damages that flow from the adoption of the Rights Plan about which he complains, and accordingly, no liability threatens the directors in that regard.  I find that demand is not excused as to the adoption of the Rights Plan.

### 3. The Amended Severance Agreements and the Bonus Plans

The Plaintiff also argues that the Board breached its fiduciary duties by approving the amended severance agreements and the bonus plans.  The decision to approve the bonus plans took place after the Plaintiff filed his initial complaint, by

---

[206] *Cottle*, 1990 WL 34824, at *8; *see also* 1 Arthur Fleischer, Jr. & Alexander R. Sussman, *Takeover Defenses: Mergers and Acquisitions* § 5.06[D][2] (7th ed. 2015) ("With respect to the requirement of a reasonably perceived threat, it [is] . . . clear . . . that the courts will be willing to accept that virtually any company is vulnerable to hostile takeover tactics which could subject the company and its stockholders to significant disadvantage and that a board is justified in adopting a pill to protect against this risk." (footnote omitted)).

which time Reyhani had filled a vacancy on the board created by Fish's departure.[207]

Thus, with respect to this decision, the operative Board for demand-futility purposes consists of Niv, Ahdout, Grossman, Sakhai, Yusupov, Brown, Davis, Reyhani, Gruen, LeGoff, and Silverman.[208] Brown, Davis, Reyhani, Gruen, LeGoff, and Silverman were outside directors, and they constituted a majority of the Board. Since the Plaintiff first attacked the amended severance agreements in his initial complaint, the relevant Board is almost the same as that for the bonus plans, except that Fish was still a director and Reyhani had yet to take his seat.[209]

The Plaintiff argues that demand is excused as to these transactions because the outside directors who approved them were dominated and controlled by the insider defendants, who stood to benefit financially from the transactions. The executives who received the amended severance packages "would[, upon termination,] be entitled to (1) two times their annual base salary on the termination date, [and] (2) their annual target bonus (which is 200% of the executive's annual base salary)."[210] These executives received a base salary of $800,000. Niv, Sakhai, Ahdout, and Yusupov also became subject to new incentive-based bonus plans, as a

---

[207] Compl. ¶ 23.
[208] Since the Plaintiff concedes that demand as to the bonus plans must be shown to be futile with respect to the Board as it existed after the Plaintiff amended his initial complaint, Pl.'s Answering Br. 39, I do not analyze the question of the relevant Board for determining demand under the framework set out in *Braddock v. Zimmerman*, 906 A.2d 776 (Del. 2006).
[209] Again, I follow here the Plaintiff's view as to the relevant Board for demand-futility purposes. Pl.'s Answering Br. 39.
[210] Compl. ¶ 113.

result of which their compensation more than doubled between 2014 and 2015. And in April 2016, FXCM amended these bonus plans in a way that allegedly made it easier for the executives to obtain bonuses. The Plaintiff's theory of demand futility is that the outside directors lacked independence as to these transactions because their board positions, and the compensation associated with them, would be in jeopardy if they voted against deals that financially benefited the controlling insider defendants.

"Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences."[211] A plaintiff may establish a director's lack of independence by alleging facts creating "a reasonable doubt that a director is so beholden to an interested director that his or her discretion would be sterilized."[212] To raise doubts about a director's independence, a plaintiff "must allege particularized facts manifesting 'a direction of corporate conduct in such a way as to comport with the wishes or interests of the corporation (or persons) doing the controlling.'"[213] "Allegations as to one's position as a director and the receipt of director's fees, without more, however, are not enough for purposes of pleading demand futility."[214]

---

[211] *Aronson*, 473 A.2d at 816.
[212] *Highland Legacy Ltd. v. Singer*, 2006 WL 741939, at *5 (Del. Ch. Mar. 17, 2006).
[213] *Aronson*, 473 A.2d at 816 (quoting *Kaplan v. Centex Corp.*, 284 A.2d 119, 123 (Del. Ch. 1971)).
[214] *In re The Ltd., Inc. S'holders Litig.*, 2002 WL 537692, at *4 (Del. Ch. Mar. 27, 2002); *see also Benihana of Tokyo, Inc. v. Benihana, Inc.*, 891 A.2d 150, 175 (Del. Ch. 2005) ("[T]he fact that directors receive fees for their services does not establish an entrenchment motive on their part."

Moreover, "conclusory allegations of domination and control are insufficient to excuse pre-suit demand."[215] And "[s]tock ownership alone, even a majority interest, is insufficient proof of 'domination or control' over a board of directors."[216] Instead, the plaintiff must allege "particularized facts showing that an individual person or entity interested in the transaction controlled the board's vote on the transaction."[217]

The Plaintiff has failed to allege facts supporting a reasonable inference that the insider defendants controlled and dominated the outside directors with respect to the challenged transactions. The Plaintiff alleges that "[t]he combination of their high-level executive and director positions, their influence over the Company's Board and their aggregate stock holdings, qualifies the FXCM Insider Defendants as controlling shareholders."[218] But the conclusion that the insider defendants were controllers is unsupported by any specific factual allegations detailing the manner in which these defendants supposedly exerted control over the outside directors. True,

(citing *Kahn v. MSB Bancorp, Inc.*, 1998 WL 409355, at *3 (Del. Ch. July 16, 1998), *aff'd*, 734 A.2d 158 (Del. 1999))).

[215] *Ash v. McCall*, 2000 WL 1370341, at *7 (Del. Ch. Sept. 15, 2000).

[216] *Katz v. Halperin*, 1996 WL 66006, at *8 (Del. Ch. Feb. 5, 1996) (quoting *Aronson*, 473 A.2d at 815).

[217] *Kahn v. Roberts*, 1994 WL 70118, at *5 (Del. Ch. Feb. 28, 1994); *see also Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1054 (Del. 2004) ("A stockholder's control of a corporation does not excuse presuit demand on the board without particularized allegations of relationships between the directors and the controlling stockholder demonstrating that the directors are beholden to the stockholder."); *In re Paxson Commc'n Corp. S'holders Litig.*, 2001 WL 812028, at *9 (Del. Ch. July 12, 2001) ("Even where the *potential* for domination or control by a controlling shareholder exists, the complaint must allege particularized allegations that would support an inference of domination or control.").

[218] Compl. ¶ 64.

43

the insider defendants collectively held 27.7% of FXCM's voting power. But while a minority stockholder may in appropriate circumstances be deemed a controlling stockholder who dominated the directors, "[a]n allegation of controlling stock ownership does not raise, *per se*, a reasonable doubt as to the board's independence."[219] Instead, the plaintiff must "plead *particularized facts* alleging that directors, constituting a majority of the board, were dominated or controlled by a party with an interest in the transaction and thus unable to independently exercise business judgment."[220] Such facts are wholly absent from the Complaint. Accordingly, since the Plaintiff's theory of demand futility here depends on the existence of a controlling stockholder with the ability and willingness to terminate the outside directors' directorships, I conclude that demand is not excused under *Aronson*'s first prong as to the amended severance agreements and the bonus plans.

The Plaintiff attempts to show demand futility under *Aronson*'s second prong by alleging that the amended severance agreements and the bonus plans constituted waste. To successfully plead waste, a plaintiff "must allege particularized facts that lead to a reasonable inference that the director defendants authorized 'an exchange that is so one sided that no business person of ordinary, sound judgment could

---

[219] *Heineman v. Datapoint Corp.*, 611 A.2d 950, 955 (Del. 1992), *overruled on other grounds by Brehm*, 746 A.2d at 253.

[220] *Bodkin v. Mercantile Stores Co.*, 1996 WL 652763, at *2 (Del. Ch. Nov. 1, 1996) (emphasis added).

conclude that the corporation has received adequate consideration.'"[221]   Put differently, "[i]f . . . there is any substantial consideration received by the corporation, and if there is a good faith judgment that in the circumstances the transaction is worthwhile, there should be no finding of waste."[222]   This Court has held that "merely poor, misguided, or loss-making transactions are insufficient for a finding of waste."[223]   Accordingly, the standard for showing waste is "obviously an extreme test, very rarely satisfied by a shareholder plaintiff."[224]   These principles apply with equal force in the area of executive compensation.   "So long as there is some rational basis for directors to conclude that the amount and form of compensation is appropriate and likely to be beneficial to the corporation, the grant will not constitute waste."[225]   Thus, "allegations that compensation is 'excessive or even lavish . . . are insufficient as a matter of law to meet the standard required for a claim of waste.'"[226]

The Plaintiff's waste claim premised on the insider defendants' compensation fails because the Complaint discloses a rational business purpose for the Board's decisions in this area: retaining top FXCM executives at a time when the Company

---

[221] *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 136 (Del. Ch. 2009) (quoting *Brehm*, 746 A.2d at 263).

[222] *Lewis v. Vogelstein*, 699 A.2d 327, 336 (Del. Ch. 1997) (emphasis omitted).

[223] *Orloff v. Shulman*, 2005 WL 3272355, at *11 (Del. Ch. Nov. 23, 2005).

[224] *Steiner v. Meyerson*, 1995 WL 441999, at *1 (Del. Ch. July 19, 1995).

[225] *Id.* at *8.

[226] *Espinoza v. Zuckerberg*, 124 A.3d 47, 67 (Del. Ch. 2015) (quoting *In re 3COM Corp.*, 1999 WL 1009210, at *5 (Del. Ch. Oct. 25, 1999)).

was undergoing serious difficulties. These executives were FXCM founders, and given the dire straits the Company found itself in after the Flash Crash, the Board could have reasonably concluded that incentivizing them to help the Company recover was important.[227] The Plaintiff may not be satisfied with the quality of the services provided by these executives, but it is clear from the Complaint that the Board's decisions in this area "reflect[] at least some element of bilateral exchange and that there were rational bases for the Board to agree to [them]."[228] I therefore reject the Plaintiff's attempt to show demand futility as to the amended severance packages and the bonus plans via a waste claim.[229]

### 4. The Alleged Violations of Regulation 5.16

I turn now to the Plaintiff's claim that the Defendants breached their fiduciary duties by allowing or causing FXCM to follow a business model allegedly premised on violations of Regulation 5.16. The Plaintiff alleges both that the Defendants adopted a business plan premised on violations of Regulation 5.16 and that they chose to ignore various red flags related to these purported violations. According to the Plaintiff, I must evaluate demand futility as to the first theory of liability under

---

[227] *See Official Comm. of Unsecured Creditors of Integrated Health Servs., Inc. v. Elkins*, 2004 WL 1949290, at *18 (Del. Ch. Aug. 24, 2004) ("Delaware law recognizes that retention of key employees may itself be a benefit to the corporation.").

[228] *Zucker v. Andreessen*, 2012 WL 2366448, at *10 (Del. Ch. June 21, 2012).

[229] For the same reasons, the Complaint fails to adequately plead facts demonstrating that demand is excused with respect to the unjust enrichment claim against the corporate officers, which is, obviously, subsidiary to the breach of duty claim addressed above.

46

*Aronson*, while the second theory requires me to evaluate demand futility under *Rales*. Under either approach, however, the fundamental question is the same: was the Board as it was constituted when the Plaintiff filed his Complaint[230] capable of exercising its business judgment in evaluating a demand involving these allegations?[231] The Plaintiff does not allege that the Defendants were interested or lacked independence with respect to the alleged violations of Regulation 5.16. Thus, the only avenue for pleading demand futility available to the Plaintiff is to successfully allege that the Defendants face a substantial likelihood of liability because they violated the duty of loyalty by allowing or causing the Company to become a lawbreaker. For the reasons set out below, I find that the Plaintiff has successfully pled demand futility as to FXCM's purportedly unlawful conduct.

The Plaintiff's allegations about FXCM's supposed violations of Regulation 5.16 were principally treated in briefing as a *Caremark* claim. Typically, *Caremark* claims involve "a breach of the duty of loyalty arising from a director's bad-faith

---

[230] Since the Plaintiff first made allegations pertaining to FXCM's alleged violations of Regulation 5.16 in his Complaint, I must consider whether demand would have been futile with respect to Board as it was constituted when the Complaint was filed. *See Braddock*, 906 A.2d at 786 ("[W]hen an amended derivative complaint is filed, the existence of a new independent board of directors is relevant to a Rule 23.1 demand inquiry only as to derivative claims in the amended complaint that are not already validly in litigation." (footnote omitted)).

[231] *See In re China Agritech, Inc. S'holder Derivative Litig.*, 2013 WL 2181514, at *16 ("[T]he *Rales* test asks whether a director would face a substantial risk of liability as a result of the litigation. To determine whether the participating directors would face a substantial risk of liability in litigation challenging their prior decisions, a reviewing court examines whether the directors had a personal interest in the decisions, were not independent with respect to the decisions, or otherwise would not enjoy the protections of the business judgment rule. Those are precisely the questions that *Aronson* asks.").

47

failure to exercise oversight over the company."[232]  In *Stone v. Ritter*,[233] our Supreme

Court embraced the theory of director liability set out in *Caremark*, holding that such

a claim required a showing that "(a) the directors utterly failed to implement any

reporting or information system or controls; *or* (b) having implemented such a

system or controls, consciously failed to monitor or oversee its operations thus

disabling themselves from being informed of risks or problems requiring their

attention."[234]  But the allegations here do not really involve "oversight" as that

concept is usually applied (although the allegations here can fit under *Stone*'s second

clause).  The Plaintiff's allegation here is that the directors are liable as a result of

knowingly causing, or knowingly failing to prevent, violations of positive law.

Where directors intentionally cause their corporation to violate positive law, they act

in bad faith; this state does not "charter lawbreakers."[235]  While a Delaware

corporation may "pursue diverse means to make a profit," it remains "subject to a

critical statutory floor, which is the requirement that Delaware corporations only

pursue 'lawful business' by 'lawful acts.'"[236]  "As a result, a fiduciary of a Delaware

---

[232] *Rich ex rel. Fuqi Int'l, Inc. v. Yu Kwai Chong*, 66 A.3d 963, 980 (Del. Ch. 2013).
[233] 911 A.2d 362 (Del. 2006).
[234] *Id.* at 370.
[235] *In re Massey Energy Co.*, 2011 WL 2176479, at *20 (Del. Ch. May 31, 2011).
[236] *Id.*

corporation cannot be loyal to a Delaware corporation by knowingly causing it to seek profits by violating the law."[237]

Similarly, knowing failure to prevent such a violation implies bad faith. "Where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith."[238]

Here, Regulation 5.16 prohibits an FX trader from:

> represent[ing] that it will, with respect to any retail foreign exchange transaction in any account carried by a retail foreign exchange dealer or futures commission merchant for or on behalf of any person:
> (1) Guarantee such person against loss;
> (2) *Limit the loss of such person*; or
> (3) Not call for or attempt to collect security deposits, margin, or other deposits as established for retail forex customers.[239]

The Defendants do not meaningfully contend that I may infer from the facts in the Complaint that the directors were unaware of this legal prohibition against limitation of customer loss, given the disclosures in the Company's Form 10-Ks. Nor do they so argue that the directors were unaware that, with respect to its core business, retail FX trading, the Company openly and publicly touted that it would

---

[237] *Id.*; *see also Desimone v. Barrows*, 924 A.2d 908, 934 (Del. Ch. 2007) ("Although directors have wide authority to take lawful action on behalf of the corporation, they have no authority knowingly to cause the corporation to become a rogue, exposing the corporation to penalties from criminal and civil regulators. Delaware corporate law has long been clear on this rather obvious notion; namely, that it is utterly inconsistent with one's duty of fidelity to the corporation to consciously cause the corporation to act unlawfully.").

[238] *Stone*, 911 A.2d at 370 (footnote omitted).

[239] 17 C.F.R. § 5.16 (emphasis added).

forgo pursuing customer losses, beyond margin investment, by its customers; a policy intended, obviously, to gain market share and corporate profits. The Defendants *do* argue that I may not infer that the directors were aware that the no-debit policy violated the Regulation, at least until the CFTC brought its action alleging precisely that in August 2016.[240] And they point out that the Complaint is silent about any CFTC action or warning before this time, and about anything else that would have demonstrated illegality to the Board.

With regard to a more complex and nuanced law that did not threaten a key source of FXCM's profits, or a more ambiguous Company policy, the Defendants would undoubtedly be right that something more would need to be pled to invoke scienter; for example, some indication making it inescapable to the Board that it must act to prevent implementation of corporate policy, absent which positive law would be violated. It would be a perverse incentive indeed were directors held liable because a regulator adopted a legal interpretation at odds with a rationally compliant, if ultimately unavailing, position adopted by the corporation.[241] It would be equally

---

[240] *See* Defs.' Reply Br. 11–12 (arguing that the "red flags" offered by the Plaintiff all "suffer from the same fatal flaw—they fail to establish that the Board was aware that FXCM's negative balance policy ***violated*** Regulation 5.16. The fact that the Board was aware of FXCM's negative balance policy and Regulation 5.16 in light of statements in FXCM's public filings and marketing materials misses the mark. The pertinent question is whether the Board knew that FXCM was violating Regulation 5.16 and nonetheless permitted FXCM to proceed with its negative balance policy. The [Complaint] is devoid of any such facts").

[241] *See Melbourne Mun. Firefighters' Pension Tr. Fund v. Jacobs*, 2016 WL 4076369, at \*12 (Del. Ch. Aug. 1, 2016) ("The Complaint . . . acknowledges that the Board consistently expressed—both verbally and through its actions—its view that its business practices were not violative of

perverse to hold directors responsible for knowledge of every regulation or law that might impact their entity, or for every policy undertaken by corporate employees; that is the basis for the scienter requirement and the focus on purported red flags implying director knowledge.

Here, I find the situation different from that described above. The primary pursuit of the Company was retail FX trading.[242] The Company pursued clients explicitly on the ground that FXCM would hold them harmless for loss beyond investment, in contradistinction to competing FX brokers.[243] I infer, and the Defendants do not seriously contend otherwise, that the directors understood that FXCM was engaged in this policy. I also infer, based on the facts alleged and the Form 10-Ks, that the directors were aware of Regulation 5.16 and its prohibition on advising clients that the Company would limit trading loss. The only question here is whether, under these facts, I may infer that the directors knew the no-debit policy violated the Regulation. This the Defendants contest. They point out that the Complaint fails to allege any enforcement by the CFTC itself of Regulation 5.16

---

international antitrust laws and elected to address the relevant legal actions by focusing on educating industry participants and government officials as to why its practices were legal and by pursuing appeals."), *aff'd* 158 A.3d 449 (Table) (Del. 2017).

[242] *See* Compl. ¶ 28 ("Retail trading is the main source of FXCM's profits, with 76.6% of its 2014 trading revenues derived from retail and 23.4% from institutional customers.").

[243] *See, e.g., id.* ¶ 54 ("A narrator on one official marketing video on the FXCM YouTube channel clearly and unequivocally stated: 'FXCM guarantees a client's trading risk is limited to the equity in their account. This means you will never owe a deficit balance as a result of trading even if a significant amount of leverage is used. This is an important safeguard most forex brokers don't provide.'").

against FXCM, despite the Company's open touting of its policy for a period of several years following adoption of the Regulation. According to the Defendants, this bolsters an inference[244] that an interpretation exists that the no-debit policy did not violate Regulation 5.16,[245] and thus that an inference of scienter on the part of the directors is impermissible.

The Defendants may well be proved correct that, on a developed record, the Plaintiff cannot demonstrate that the directors willfully acted, or refrained from a known duty to act, causing the Company to violate the law. I find, however, that the Regulation itself, on my reading, clearly prohibits touting loss limitations to clients, and I find that the Company did precisely that. That reading is based on the plain language of the Regulation; it is, I believe, bolstered by the purposes given by the CFTC for the adoption of Regulation 5.16, which include avoiding the kind of excessive trading risk that has crippled FXCM here.[246] Given that finding, and given the strong inference that the directors were aware of the Regulation and the Company's policy as well, my reading of Regulation 5.16 is sufficient at the

---

[244] I agree that the Company's brazen touting of its loss-limitation policy is puzzling, and tends to cut against scienter on the part of the Board, but not sufficiently to rebut the pleadings-stage inferences described in favor of such a finding.

[245] According to the interpretations advanced by the Defendants, the Board could have reasonably believed that the no-debit policy did not violate Regulation 5.16, because FXCM did not guarantee its customers against losses; it merely promised not to collect debit balances.

[246] *See id.* ¶ 39 ("Regulation 5.16 was intended to protect companies from 'extremely volatile events.' The CFTC remarked in the Supplementary Information of Regulation 5.16 that not all retail forex counterparties have 'technology [that] allows for automatic liquidation of positions if the account balance falls below margin requirements.'" (alteration in original) (footnote omitted)).

pleadings stage to infer scienter. I pause to emphasize that this case presents a highly unusual set of facts: a Delaware corporation with a business model allegedly reliant on a clear violation of a federal regulation; a situation of which I can reasonably infer the Board was aware. I find, under these unusual facts, that a substantial threat of personal liability renders the Board incapable of disinterestedly evaluating a litigation demand, and demand is excused. Thus, the Complaint also states a claim, and the Motion to Dismiss under both Rules 12(b)(6) and 23.1 is denied.[247]

I note that the Defendants also sought dismissal of this Count on laches grounds. If, under the facts and law I have found applicable here, the Defendants wish me to consider laches, they should so notify me. Alternatively, they may renotice the issue on a developed record. I make no determination on laches here.

### B. The Motion to Supplement

Finally, I consider the Plaintiff's Motion to Supplement the Third Amended Complaint under Court of Chancery Rule 15(d). The Motion to Supplement was made after briefing was complete and after oral argument on the Motion to Dismiss. I then held a separate oral argument on the Motion to Supplement.[248] It became

---

[247] *See McPadden v. Sidhu*, 964 A.2d 1262, 1270 (Del. Ch. 2008) ("Because the standard under Rule 12(b)(6) is less stringent than that under Rule 23.1, a complaint that survives a motion to dismiss pursuant to Rule 23.1 will also survive a 12(b)(6) motion to dismiss, assuming that it otherwise contains sufficient facts to state a cognizable claim." (footnotes omitted)).

[248] The gravamen of the Plaintiff's new proposed pleading is that the Company had an undisclosed interest in a market maker with which it was making FX trades on behalf of its clients, so that its interests diverged from its clients, in a way that violated the Commodity Exchange Act; and that

53

clear at that oral argument that what the Plaintiff truly desired was to further amend the Third Amended Complaint, to include allegations relating to the February CFTC Order.[249] The motion was styled a "Motion to Supplement," I surmise, to avoid the strictures of Court of Chancery Rule 15(aaa), which prohibits such an amendment during pendency of a motion to dismiss, after the Plaintiff has filed an answering brief.[250] Having now denied the Motion to Dismiss, in part, the Plaintiff may refile his motion as a Motion to Amend, to the extent he finds such a motion appropriate.

## III. CONCLUSION

For the foregoing reasons, the Defendants' Motion to Dismiss is granted in part and denied in part. Consideration of the laches defense is deferred. The parties should submit an appropriate form of order.

---

failure to prevent these actions represented bad faith on the part of the FXCM Board. Pl.'s Mot. for Leave to File a Supplement to the Compl. 3–4.

[249] *See* May 17, 2017 Oral Arg. Tr. 7:24–8:13 ("THE COURT: But it is clear to me that since you are saying I need to take into account the supplement in deciding the motion to dismiss, that this is strictly within the purview of [Rule] 15(aaa) no matter how you characterize this, as a supplement or as an amendment. You are seeking to amend the universe of alleged facts under which I have to consider the motion to dismiss. And the question . . . to me . . . is simply this: The fact that, through no fault of the plaintiff, these preexisting facts were unknowable at the time the answer was filed, is that the equivalent of good cause under [Rule] 15(aaa) to allow either an amendment or supplement? That, really, is what we're talking about here, isn't it? MR. AMADOR: That sounds right.").

[250] *See E. Sussex Assocs., LLC v. W. Sussex Assocs., LLC*, 2013 WL 2389868, at *1 (Del. Ch. June 3, 2013) ("Rule 15(aaa) requires a plaintiff that wishes to amend its complaint in response to a motion to dismiss to file its amended complaint before responding to the motion to dismiss." (citing Ct. Ch. R. 15(aaa))).