Steven M. RALES, Mitchell P. Rales, and John Doe 1–10, Defendants Below, Appellants, and

Easco Hand Tools, Inc. and Danaher Corporation, Nominal Defendants Below, Appellants,

v.

Alfred BLASBAND, derivatively and on behalf of Easco Hand Tools, Inc. and Danaher Corporation, Plaintiff Below, Appellee.

Supreme Court of Delaware.

Submitted: Oct. 4, 1993.
Decided: Dec. 22, 1993.
Revised: Dec. 23, 1993.

Stephen P. Lamb (argued), Robert A. Glen, Cathy L. Reese and Jaya B. Gokhale of Skadden, Arps, Slate, Meagher & Flom, Wilmington, for appellants Steven M. Rales and Mitchell P. Rales.

David C. McBride of Young, Conaway, Stargatt & Taylor, Wilmington, for appellants Danaher Corp. and Easco Hand Tools, Inc.

Mark Minuti of Saul, Ewing, Remick & Saul, Wilmington, Stephen A. Whinston (argued), and Arthur Stock of Berger & Montague, P.C., Philadelphia, PA, for appellee Alfred Blasband.

Before VEASEY, C.J., MOORE and HOLLAND, JJ.

VEASEY, Chief Justice:

This certified question of law comes before the Court pursuant to Article IV, Section 11(9) of the Delaware Constitution and Supreme Court Rule 41. The question of law was certified by the United States District Court for the District of Delaware (the "District Court"), and was accepted by this Court on June 16, 1993. *See Rales v. Blasband,* Del.Supr., 626 A.2d 1364 (1993). Briefing and oral argument in this Court followed. This is the decision of the Court on the certified question.

The underlying action pending in the District Court is a stockholder derivative action

filed on March 25, 1991, by Alfred Blasband ("Blasband") on behalf of Danaher Corporation, a Delaware corporation ("Danaher"). Blasband's original complaint was dismissed by the District Court on August 15, 1992, based on Blasband's lack of standing, but the United States Court of Appeals for the Third Circuit (the "Third Circuit") vacated the District Court's order and permitted Blasband to amend his complaint. *Blasband v. Rales,* 971 F.2d 1034 (3d Cir.1992) (*"Blasband* I"). Following Blasband's filing of an amended complaint (the "amended complaint"), the defendants filed a motion to dismiss and moved to certify the following question of law to this Court:

> In the context of this novel action, which is neither a simple derivative suit nor a double derivative suit, but which the United States Court of Appeals for the Third Circuit describes as a "first cousin to a double derivative suit," has plaintiff Alfred Blasband, in accordance with the substantive law of the State of Delaware, alleged facts to show that demand is excused on the board of directors of Danaher Corporation, a Delaware corporation?

After consideration of the allegations of the amended complaint, the briefs, and the oral argument of the parties in this Court, it is our conclusion that the certified question must be answered in the affirmative. Because the amended complaint does not challenge a decision of the board of directors of Danaher (the "Board"), the test enunciated in *Aronson v. Lewis,* Del.Supr., 473 A.2d 805 (1984) is not implicated. In the unusual context of this case, demand on the Board is excused because the amended complaint alleges particularized facts creating a reasonable doubt that a majority of the Board would be disinterested or independent in making a decision on a demand.

**1.** The District Court's Order Certifying Question of Law to the Delaware Supreme Court, dated June 9, 1993, states that "the allegations of the verified amended complaint ... set forth the undisputed facts." Therefore, the facts set forth herein are taken from the amended complaint.

## I. FACTS [1]

Blasband is currently a stockholder of Danaher. Prior to 1990 Blasband owned 1100 shares of Easco Hand Tools, Inc., a Delaware corporation ("Easco"). Easco entered into a merger agreement with Danaher in February 1990 whereby Easco became a wholly-owned subsidiary of Danaher (the "Merger").

Steven M. Rales and Mitchell P. Rales (the "Rales brothers") have been directors, officers, or stockholders of Easco and Danaher at relevant times. Prior to the Merger, the Rales brothers were directors of Easco, and together owned approximately 52 percent of Easco's common stock. They continued to serve as directors of Easco after the Merger.

The Rales brothers also own approximately 44 percent of Danaher's common stock. Prior to the Merger, Mitchell Rales was President and Steven Rales was Chief Executive Officer of Danaher. The Rales brothers resigned their positions as officers of Danaher in early 1990, but continued to serve as members of the Board.[2] The Board consists of eight members. The other six members are Danaher's President and Chief Executive Officer, George Sherman ("Sherman"), Donald E. Ehrlich ("Ehrlich"), Mortimer Caplin ("Caplin"), George D. Kellner ("Kellner"), A. Emmett Stephenson, Jr. ("Stephenson"), and Walter Lohr ("Lohr"). A number of these directors have business relationships with the Rales brothers or with entities controlled by them.[3]

The central focus of the amended complaint is the alleged misuse by the Easco board of the proceeds of a sale of that company's 12.875% Senior Subordinated Notes due 1998 (the "Notes"). On or about September 1, 1988, Easco sold $100 million of the Notes in a public offering (the "Offering"). The prospectus for the Offering stated that the proceeds from the sale of the Notes would be used for (1) repaying outstanding

**2.** Steven Rales is the Chairman of the Board and Mitchell Rales is Chairman of the Executive Committee of the Board.

**3.** The Rales brothers' business relationships with Sherman and Ehrlich are detailed in the section of this opinion addressing the independence of the Board.

indebtedness, (2) funding corporate expansion, and (3) general corporate purposes. The prospectus further stated that "[p]ending such uses, the Company will invest the balance of the net proceeds from this offering in government and other marketable securities which are expected to yield a lower rate of return than the rate of interest borne by the Notes."

Blasband alleges that the defendants did not invest in "government and other marketable securities," but instead used over $61.9 million of the proceeds to buy highly speculative "junk bonds" offered through Drexel Burnham Lambert Inc. ("Drexel"). Blasband alleges that these junk bonds were bought by Easco because of the Rales brothers' desire to help Drexel at a time when it was under investigation and having trouble selling such bonds. The amended complaint describes the prior business relationship between the Rales brothers and Drexel in the mid–1980s, including Drexel's assistance in the Rales brothers' expansion of Danaher through corporate acquisitions and the role played by Drexel in the Rales brothers' attempt to acquire Interco, Inc. Moreover, Drexel was the underwriter of the Offering of Easco's Notes.

The amended complaint alleges that these investments have declined substantially in value, resulting in a loss to Easco of at least $14 million. Finally, Blasband complains that the Easco and Danaher boards of directors refused to comply with his request for information regarding the investments.[4]

## II. SCOPE AND STANDARD OF REVIEW

■ Because we are addressing a certified question of law, as distinct from a review of a lower court decision, the normal standards of review do not apply. This matter is presented in the context of a motion to dismiss Blasband's amended complaint filed in the District Court pursuant to Federal Rule of Civil Procedure ("Fed.R.Civ.P.") 23.1 for failure to demonstrate that demand on the Board is excused. The well-pleaded factual allegations of the derivative complaint are accepted as true on such a motion. *E.g., In re General Motors Class E Stock Buyout Sec. Litig.*, 790 F.Supp. 77, 81 (D.Del.1992). *See also Grobow v. Perot*, Del.Supr., 539 A.2d 180, 186 (1988). Conclusory allegations, however, are not accepted as true. *In re General Motors*, 790 F.Supp. at 81. *See also Allison v. General Motors Corp.*, 604 F.Supp. 1106 (D.Del.1985), *aff'd*, 782 F.2d 1026 (3d Cir.1986).

■ The scope of the issues that may be considered in addressing a certified question is limited by the procedural posture of the case. Supreme Court Rule 41(a) provides that this Court may not accept a certified question of law unless "the certifying court has not decided the question in the case." The question of Blasband's standing to pursue the derivative claims in the amended complaint has already been decided by the Third Circuit. *Blasband* I, 971 F.2d at 1046. That ruling therefore is the law of the case, and cannot be reconsidered by this Court in the present proceeding. *See Blasband v. Rales*, 979 F.2d 324 (3d Cir.1992) ("*Blasband* II") (holding in mandamus action that the District Court was precluded from certifying essentially the same standing question when the Court of Appeals had already decided the issue). The same principle applies to other determinations made by the Third Circuit in its decision.[5]

---

4. There is no indication that Blasband availed himself of 8 *Del.C.* § 220, which permits a stockholder, upon complying with the procedural requirements of the statute and upon showing a specific proper purpose, to obtain in a summary proceeding an order permitting inspection of specific books and records.

5. Our recognition of the limited scope of the present proceeding should not be interpreted as either an acceptance or a rejection of the Third Circuit's conclusions on matters of the substantive Delaware corporation law relating to the standing issue decided in *Blasband* I. At the time the Third Circuit considered the standing issue, it was not able to certify that issue to this Court. As a result of a recent amendment (adopted in January 1993) to Article IV, Section 11(9) of the Delaware Constitution, any Article III federal court, or the highest appellate court of any other state, may now certify a question of law to this Court as long as the criteria in Supreme Court Rule 41(b) are met. *See Draper v. Gardner Defined Plan Trust*, Del.Supr., 625 A.2d 859, 868 n. 12 (1993).

■ The parties have raised a threshold issue regarding this Court's ability to consider the legal standards which are applicable to the certified question. Blasband contends that the role of this Court in responding to the certified question is limited to a mechanical application of the two-part test [6] set forth in *Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 814 (1984). The defendants disagree, and argue that the Court should apply a test more stringent than the *Aronson* test to protect corporations against strike suits.

Consideration of this issue must begin with the language of the certified question itself:

> In the context of this novel action, which is neither a simple derivative suit nor a double derivative suit, but which the United States Court of Appeals for the Third Circuit describes as a "first cousin to a double derivative suit," has plaintiff Alfred Blasband, **in accordance with the substantive law of the State of Delaware,** alleged *facts to show that demand is excused on* the board of directors of Danaher Corporation, a Delaware corporation?

(Emphasis added). The certified question does not limit the issue presented to the mere application of the *Aronson* test, but instead calls upon this Court to decide whether Blasband's amended complaint establishes that demand is excused under the "substantive law of the State of Delaware." It is therefore necessary for this Court to determine what the applicable "substantive law" is before we can decide whether demand on the Board should be excused. According-ly, the language of the question certified to this Court requires a consideration of the appropriate legal principles, including the applicability of the *Aronson* test in this unusual context, so that we may properly decide the issue presented to us.

## III. THE STANDARDS FOR DETERMINING WHETHER DEMAND IS EXCUSED IN THIS DERIVATIVE SUIT

■ The stockholder derivative suit is an important and unique feature of corporate governance. In such a suit, a stockholder asserts a cause of action belonging to the corporation. *Aronson,* 473 A.2d at 811; *Levine v. Smith,* Del.Supr., 591 A.2d 194, 200 (1991). In a double derivative suit, such as the present case, a stockholder of a parent corporation seeks recovery for a cause of action belonging to a subsidiary corporation. *See Sternberg v. O'Neil,* Del.Supr., 550 A.2d 1105, 1123–24 (1988). Because directors are empowered to manage, or direct the management of, the business and affairs of the corporation, 8 *Del.C.* § 141(a), the right of a stockholder to prosecute a derivative suit is limited to situations where the stockholder has demanded that the directors pursue the corporate claim and they have wrongfully refused to do so or where demand is excused because the directors are incapable of making an impartial decision regarding such litigation. *Levine,* 591 A.2d at 200. Fed. R.Civ.P. 23.1, like Chancery Court Rule 23.1, constitutes the procedural embodiment of this substantive principle of corporation law.[7]

6. In *Aronson,* this Court held that demand is excused if the derivative complaint pleads particularized facts creating a reasonable doubt that "(1) the directors are disinterested and independent [or] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." 473 A.2d at 814.

7. The United States Supreme Court has recognized that the demand requirements for a derivative suit are determined by the law of the state of incorporation. In *Kamen v. Kemper Fin. Serv., Inc.,* 500 U.S. 90, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991), the Court held:

> In our view, the function of the demand doctrine in delimiting the respective powers of the individual shareholder and of the directors to control corporate litigation clearly is a matter of "substance" not "procedure."

....

> The presumption that state law should be incorporated into federal common law is particularly strong in areas in which private parties have entered legal relationships with the expectation that their rights and obligations would be governed by state-law standards. Corporation law is one such area.

....

> ... The scope of the demand requirement under state law clearly regulates the allocation of corporate governing powers between the directors and individual shareholders. Because a futility exception to demand does not impede the regulatory objectives of the [Investment Company Act of 1940, 15 U.S.C. § 80a–1a *et seq* ], a court that is entertaining a derivative action under that statute must apply the demand futility exception as it is defined by the law of the State of incorporation.

Derivative suits have been used most frequently as a means of redressing harm to a corporation allegedly resulting from misconduct by its directors. As we observed in *Aronson:*

> [A] stockholder is not powerless to challenge director action which results in harm to the corporation. The machinery of corporate democracy and the derivative suit are potent tools to redress the conduct of a torpid and unfaithful management.

473 A.2d at 811. In such instances, stockholders often do not make a demand on the board of directors, and instead file suit claiming that demand is excused.

Because such derivative suits challenge the propriety of decisions made by directors pursuant to their managerial authority, we have repeatedly held that the stockholder plaintiffs must overcome the powerful presumptions of the business judgment rule before they will be permitted to pursue the derivative claim. *Aronson,* 473 A.2d at 814; *Grobow,* 539 A.2d at 186; *Levine,* 591 A.2d at 200, 205–6; *Pogostin v. Rice,* Del.Supr., 480 A.2d 619, 624 (1984). Our decision in *Aronson* enunciated the test for determining a derivative plaintiff's compliance with this fundamental threshold obligation: "whether, under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent [or] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." 473 A.2d at 814.

Although these standards are well-established, they cannot be applied in a vacuum. Not all derivative suits fall into the paradigm addressed by *Aronson* and its progeny. The essential predicate for the *Aronson* test is the fact that a *decision* of the board of directors is being challenged in the derivative suit. Our discussion of the *Aronson* test in *Pogostin v. Rice* makes this clear:

> Directorial interest exists whenever divided loyalties are present, or a director has received, or is entitled to receive, a personal financial benefit **from the challenged transaction** which is not equally shared by the stockholders. The question of independence flows from an analysis of the factual allegations pertaining to the influences upon the directors' performance of their duties generally, and more specifically in respect to **the challenged transaction.**
>
> The second, or business judgment inquiry of *Aronson,* focuses on the substantive nature of **the challenged transaction and the board's approval thereof.**

480 A.2d at 624 (emphasis added) (citations omitted). *See also* III Ernest L. Folk, III, Rodman Ward, Jr., and Edward P. Welch, *Folk on the Delaware General Corporation Law* § 327.4.1.1 (1992) ("Demand is excused under this step only if a reasonable doubt is raised concerning the disinterestedness or independence of the board majority **approving the challenged transaction.**" (Emphasis added)).

■ Under the unique circumstances of this case, an analysis of the Board's ability to consider a demand requires a departure here from the standards set forth in *Aronson.* The Board did not approve the transaction which is being challenged by Blasband in this action. In fact, the Danaher directors have made no decision relating to the subject of this derivative suit. Where there is no conscious decision by directors to act or refrain from acting, the business judgment rule has no application. *Aronson,* 473 A.2d at 813. The absence of board action, therefore, makes it impossible to perform the essential inquiry contemplated by *Aronson*—whether the directors have acted in conformity with the business judgment rule in approving the challenged transaction. *See Pogostin,* 480 A.2d at 624.

■ Consistent with the context and rationale of the *Aronson* decision, a court should not apply the *Aronson* test for demand futility where the board that would be considering the demand did not make a business decision which is being challenged in the

500 U.S. at ———, ———, 111 S.Ct. at 1716–17, 1722–23 (citations omitted). Because both Danaher and Easco are Delaware corporations, the substantive corporation law of Delaware determines whether or not the demand requirements of Fed.R.Civ.P. 23.1 have been satisfied. *See also Allison,* 604 F.Supp. at 1115–16.

derivative suit. This situation would arise in three principal scenarios: (1) where a business decision was made by the board of a company, but a majority of the directors making the decision have been replaced;[8] (2) where the subject of the derivative suit is not a business decision of the board;[9] and (3) where, as here, the decision being challenged was made by the board of a different corporation.

▆▆▆ Instead, it is appropriate in these situations to examine whether the board that would be addressing the demand can impartially consider its merits without being influenced by improper considerations. Thus, a court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand. If the derivative plaintiff satisfies this burden, then demand will be excused as futile.

In so holding, we reject the defendants' proposal that, for purposes of this derivative suit and future similar suits, we adopt either a universal demand requirement or a requirement that a plaintiff must demonstrate a reasonable probability of success on the merits. The defendants seek to justify these stringent tests on the need to discourage "strike suits" in situations like the present one. This concern is unfounded.

▆▆▆ A plaintiff in a double derivative suit is still required to satisfy the *Aronson* test in order to establish that demand on the **subsidiary's** board is futile. The *Aronson* test was designed, in part, with the objective of preventing strike suits by requiring derivative plaintiffs to make a threshold showing, through the allegation of particularized facts, that their claims have some merit. *Aronson,* 473 A.2d at 811–12. Moreover, defendants' proposal of requiring demand on the parent board in all double derivative cases, even where a board of directors is interested, is not the appropriate protection against strike suits. While defendants' alternative suggestion of requiring a plaintiff to demonstrate a reasonable probability of success is more closely related to the prevention of strike suits, it is an extremely onerous burden to meet at the pleading stage without the benefit of discovery.[10] Because a plaintiff must

---

8. This first scenario was addressed by the Court of Chancery in *Harris v. Carter,* Del.Ch., 582 A.2d 222 (1990):

> In the special case, however, where there is a change in board control between the date of the challenged transaction and the date of suit, it might open the way to error to focus on the board existing at the time of the challenged transaction. What, in the end, is relevant is not whether the board that approved the challenged transaction was or was not interested in that transaction but whether the present board is or is not disabled from exercising its right and duty to control corporate litigation.
>
> **I do not consider that *Aronson* intended to determine that demand under Rule 23.1 upon an independent board that has come into existence after the time of the "challenged transaction" would be excused if the board that approved the challenged transaction did not qualify for business judgment protection.**

*Id.* at 230 (emphasis added). Because the new board in *Harris* was not yet in place at the time of the original complaint in that case, the Court of Chancery did not need to determine how, or if, *Aronson* would apply where there was a change in the board prior to the derivative suit being filed.

9. For example, if a stockholder brings a derivative suit alleging that a third party breached a contract with the corporation, demand should not be excused simply because the subject matter of the suit—the third party's breach of contract—does not implicate the business judgment rule. Similarly, where directors are sued derivatively because they have failed to do something (such as a failure to oversee subordinates), demand should not be excused automatically in the absence of allegations demonstrating why the board is incapable of considering a demand. Indeed, requiring demand in such circumstances is consistent with the board's managerial prerogatives because it permits the board to have the opportunity to take action where it has not previously considered doing so.

10. Although derivative plaintiffs may believe it is difficult to meet the particularization requirement of *Aronson* because they are not entitled to discovery to assist their compliance with Rule 23.1, *see Levine,* 591 A.2d at 208–10, they have many avenues available to obtain information bearing on the subject of their claims. For example, there is a variety of public sources from which the details of a corporate act may be discovered, including the media and governmental agencies such as the Securities and Exchange Commission. In addition, a stockholder who has met the procedural requirements and has shown a specific proper purpose may use the summary procedure embodied in 8 *Del.C.* § 220 to investi-

satisfy the *Aronson* test in order to show that demand is excused on the subsidiary board, there is no need to create an unduly onerous test for determining demand futility on the parent board simply to protect against strike suits.

## IV. WHETHER THE BOARD IS INTERESTED OR LACKS INDEPENDENCE

In order to determine whether the Board could have impartially considered a demand at the time Blasband's original complaint was filed, it is appropriate to examine the nature of the decision confronting it. A stockholder demand letter would, at a minimum, notify the directors of the nature of the alleged wrongdoing and the identities of the alleged wrongdoers. The subject of the demand in this case would be the alleged breaches of fiduciary duty by the Easco board of directors in connection with Easco's investment in Drexel "junk bonds." The allegations of the amended complaint, which must be accepted as true in this procedural context, claim that the investment was made solely for the benefit of the Rales brothers, who were acting in furtherance of their business relationship with Drexel and not with regard to Easco's best interests. Such conduct, if proven, would constitute a breach of the Easco directors' duty of loyalty. *See Heineman v. Datapoint Corp.*, Del.Supr., 611 A.2d 950, 954 (1992) ("These allegations paint a picture of directors funneling corporate assets to their private use, a practice at clear variance with the directors' fiduciary obligation.")

The task of a board of directors in responding to a stockholder demand letter is a two-step process. First, the directors must determine the best method to inform themselves of the facts relating to the alleged wrongdoing and the considerations, both legal and financial, bearing on a response to the demand. If a factual investigation is required,[11] it must be conducted reasonably and in good faith. *Levine*, 591 A.2d at 213; *Spiegel v. Buntrock*, Del.Supr., 571 A.2d 767, 777 (1990). Second, the board must weigh the alternatives available to it, including the advisability of implementing internal corrective action and commencing legal proceedings. *See Weiss v. Temporary Inv. Fund, Inc.*, 692 F.2d 928, 941 (3d Cir.1982) (observing that directors, when faced with a stockholder demand, "can exercise their discretion to accept the demand and prosecute the action, to resolve the grievance internally without resort to litigation, or to refuse the demand"), *judgment vacated on other grounds*, 465 U.S. 1001, 104 S.Ct. 989, 79 L.Ed.2d 224 (1984). *See also Aronson*, 473 A.2d at 811–12 (discussing the role of the demand requirement as a "form of alternate dispute resolution" that requires the stockholder to exhaust "his intracorporate remedies"). In carrying out these tasks, the board must be able to act free of personal financial interest and improper extraneous influences.[12] We

---

gate the possibility of corporate wrongdoing. *Compaq Computer Corp. v. Horton*, Del.Supr., 631 A.2d 1 (1993). *See* n. 4, *supra*. Surprisingly, little use has been made of section 220 as an information-gathering tool in the derivative context. Perhaps the problem arises in some cases out of an unseemly race to the court house, chiefly generated by the "first to file" custom seemingly permitting the winner of the race to be named lead counsel. The result has been a plethora of superficial complaints that could not be sustained. Nothing requires the Court of Chancery, or any other court having appropriate jurisdiction, to countenance this process by penalizing diligent counsel who has employed these methods, including section 220, in a deliberate and thorough manner in preparing a complaint that meets the demand excused test of *Aronson*.

11. In most instances, a factual investigation is appropriate so that the board can be fully in-

formed about the validity, if any, of the claims of wrongdoing contained in the demand letter. Nevertheless, a formal investigation will not always be necessary because the directors may already have sufficient information regarding the subject of the demand to make a decision in response to it. *See Levine*, 591 A.2d at 214. In such a case, the minutes or other writing of the Board may properly reference that information in a summary manner.

12. Where a demand has actually been made, the stockholder making the demand concedes the independence and disinterestedness of a majority of the board to respond. *Spiegel*, 571 A.2d at 777; *Levine*, 591 A.2d at 212–13. In the present context, however, no demand has been made and the Court must determine whether the Board could have considered a demand without being affected by improper influences. *See Aronson*, 473 A.2d at 816.

now consider whether the members of the Board could have met these standards.

## A. Interest

The members of the Board at the time Blasband filed his original complaint were Steven Rales, Mitchell Rales, Sherman, Ehrlich, Caplin, Kellner, Stephenson, and Lohr. The Rales brothers and Caplin were also members of the Easco board of directors at the time of the alleged wrongdoing. Blasband's amended complaint specifically accuses the Rales brothers of being the motivating force behind the investment in Drexel "junk bonds." The Board would be obligated to determine whether these charges of wrongdoing should be investigated and, if substantiated, become the subject of legal action.

A director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders. *Aronson,* 473 A.2d at 812; *Pogostin,* 480 A.2d at 624. Directorial interest also exists where a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders. In such circumstances, a director cannot be expected to exercise his or her independent business judgment without being influenced by the adverse personal consequences resulting from the decision.

We conclude that the Rales brothers and Caplin must be considered interested in a decision of the Board in response to a demand addressing the alleged wrongdoing described in Blasband's amended complaint. Normally, "the mere threat of personal liability for approving a questioned transaction, standing alone, is insufficient to challenge either the independence or disinterestedness of directors...." *Aronson,* 473 A.2d at 815. Nevertheless, the Third Circuit has already concluded that "Blasband has pleaded facts raising at least a reasonable doubt that the [Easco board's] use of proceeds from the

Note Offering was a valid exercise of business judgment." *Blasband* I, 971 F.2d at 1052. This determination is part of the law of the case, *Blasband* II, 979 F.2d at 328, and is therefore binding on this Court. Such determination indicates that the potential for liability is not "a mere threat" but instead may rise to "a substantial likelihood." [13] *See Aronson,* 473 A.2d at 815.

Therefore, a decision by the Board to bring suit against the Easco directors, including the Rales brothers and Caplin, could have potentially significant financial consequences for those directors. Common sense dictates that, in light of these consequences, the Rales brothers and Caplin have a disqualifying financial interest that disables them from impartially considering a response to a demand by Blasband.

## B. Independence

Having determined that the Rales brothers and Caplin would be interested in a decision on Blasband's demand, we must now examine whether the remaining Danaher directors are sufficiently independent to make an impartial decision despite the fact that they are presumptively disinterested. As explained in *Aronson,* "[i]ndependence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences." 473 A.2d at 816. To establish lack of independence, Blasband must show that the directors are "beholden" to the Rales brothers or so under their influence that their discretion would be sterilized. *Id.* at 815; *Levine,* 591 A.2d at 205; *Kaplan v. Centex Corp.,* Del.Ch., 284 A.2d 119, 123 (1971); *Lewis v. Aronson,* Del.Ch., C.A. No. 6919, Hartnett, V.C. (May 1, 1985) (on remand) (holding that demand was excused because the plaintiff's amended complaint alleged sufficient specific facts to create a reasonable doubt regarding the board's independence because it was beholden to a 47 per-

---

13. We emphasize that this assessment of potential liability is based solely on the presumed truthfulness of the allegations of Blasband's amended complaint and the Third Circuit's conclusions thereon, all of which must be accepted by this Court in the present procedural posture.

No portion of our decision should be interpreted as a prediction regarding the outcome of this litigation since the Easco defendants have not had the opportunity to rebut Blasband's allegations of wrongdoing.

cent stockholder). We conclude that the amended complaint alleges particularized facts sufficient to create a reasonable doubt that Sherman and Ehrlich, as members of the Board, are capable of acting independently of the Rales brothers.

Sherman is the President and Chief Executive Officer of Danaher. His salary is approximately $1 million per year. Although Sherman's continued employment and substantial remuneration may not hinge solely on his relationship with the Rales brothers, there is little doubt that Steven Rales' position as Chairman of the Board of Danaher and Mitchell Rales' position as Chairman of its Executive Committee place them in a position to exert considerable influence over Sherman. In light of these circumstances, there is a reasonable doubt that Sherman can be expected to act independently considering his substantial financial stake in maintaining his current offices.

Ehrlich is the President of Wabash National Corp. ("Wabash"). His annual compensation is approximately $300,000 per year. Ehrlich also has two brothers who are vice presidents of Wabash. The Rales brothers are directors of Wabash and own a majority of its stock through an investment partnership they control. As a result, there is a reasonable doubt regarding Ehrlich's ability to act independently since it can be inferred that he is beholden to the Rales brothers in light of his employment.

Therefore, the amended complaint pleads particularized facts raising a reasonable doubt as to the independence of Sherman and Ehrlich. Because of their alleged substantial financial interest in maintaining their employment positions, there is a reasonable doubt that these two directors are able to consider impartially an action that is contrary to the interests of the Rales brothers.

## V. CONCLUSION

We conclude that, under the "substantive law" of the State of Delaware, the *Aronson* test does not apply in the context of this double derivative suit because the Board was not involved in the challenged transaction. Nevertheless, we do not agree with the defendants' argument that a more stringent test should be applied to deter strike suits. Instead, the appropriate inquiry is whether Blasband's amended complaint raises a reasonable doubt regarding the ability of a majority of the Board to exercise properly its business judgment in a decision on a demand had one been made at the time this action was filed. Based on the existence of a reasonable doubt that the Rales brothers and Caplin would be free of a financial interest in such a decision, and that Sherman and Ehrlich could act independently in light of their employment with entities affiliated with the Rales brothers, we conclude that the allegations of Blasband's amended complaint establish that **DEMAND IS EXCUSED** on the Board. The certified question is therefore answered in the **AFFIRMATIVE**.