IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| LENZA H. MCELRATH, III, derivatively on behalf of UBER TECHNOLOGIES, INC., | § § § § | No. 181, 2019 |
| Plaintiff Below, Appellant, | § § § | Court Below: Court of Chancery |
| v. | § § | C.A. No. 2017-0888 |
| TRAVIS KALANICK, GARRETT CAMP, RYAN GRAVES, ARIANNA HUFFINGTON, YASIR AL-RUMAYYAN, WILLIAM GURLEY, DAVID BONDERMAN, | § § § § § § § | |
| Defendants Below, Appellees. | § § § | |
| and | § § | |
| UBER TECHNOLOGIES, INC., | § § | |
| Nominal Defendant Below, Appellee. | § § § | |

Submitted: October 30, 2019
Decided: January 13, 2020

Before **SEITZ**, Chief Justice; **VALIHURA**, and **TRAYNOR**, Justices.

Upon appeal from the Court of Chancery. **AFFIRMED**.

Michael J. Barry, Esq. (*argued*), John C. Kairis, Esq., Kimberly A. Evans, Esq., GRANT & EISENHOFER P.A., Wilmington, Delaware; Jeffrey Reeves, Esq., Atlanta, Georgia; *Attorneys for Plaintiff-Appellant Lenza H. McElrath, III, derivatively on behalf of Uber Technologies, Inc.*

R. Judson Scaggs, Jr., Esq., Susan W. Waesco, Esq., Sabrina M. Hendershot, Esq., MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Susan S. Muck, Esq., Kevin P. Muck, Esq., Marie C. Bafus, Esq., FENWICK & WEST LLP, San Francisco, California; *Attorneys for Defendants-Appellees Garrett Camp, Ryan Graves, Arianna Huffington, Yasir Al-Rumayyan, William Gurley and David Bonderman.*

Donald J. Wolfe, Jr., Esq., T. Brad Davey, Esq., J. Matthew Belger, Esq., Jacob R. Kirkham, Esq., POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Joseph G. Petrosinelli, Esq., Kenneth J. Brown, Esq., WILLIAMS & CONNOLLY LLP, Washington, D.C.; *Attorneys for Defendant-Appellee Travis Kalanick.*

A. Thompson Bayliss, Esq., Michael A. Barlow, Esq., ABRAMS & BAYLISS LLP, Wilmington, Delaware; Mark Gimbel, Esq. (*argued*), C. William Phillips, Esq., COVINGTON & BURLING, LLP, New York, New York; Bryant Pulsipher, Esq., COVINGTON & BURLING, LLP, San Francisco, California; *Attorneys for Nominal Defendant-Appellee Uber Technologies, Inc.*

**SEITZ**, Chief Justice:

In 2016, Uber Technologies, Inc. acquired Ottomotto LLC to gain more traction in the autonomous vehicle space. The acquisition was high risk from the start. Although Uber ostensibly bought a company, and paid only $100,000 up front, it hired key employees from Google's more mature autonomous vehicle program. Uber took some steps to ensure the former Google employees did not misuse Google's confidential information, but the transaction ended in embarrassment. Uber fired its key hire from Google after it came to light Google's proprietary information had been misused. It also ended up settling Google's misappropriation claims by issuing additional Uber stock to Google valued at $245 million.

The plaintiff, an Uber stockholder and former Uber employee, filed suit in the Court of Chancery against the directors who approved the Otto acquisition. The plaintiff claimed that the directors ignored the alleged theft of Google's intellectual property and failed to investigate pre-closing diligence that would have revealed problems with the transaction. According to the plaintiff, the board should not have relied on the CEO's representations that the transaction had the necessary protections because he and Uber had a history of misusing the intellectual property of others.

The defendants responded by moving to dismiss the complaint under Court of Chancery Rule 23.1. As they asserted, the plaintiff first had to make a demand on the board of directors before pursuing litigation on the corporation's behalf. The

3

Court of Chancery found that a majority of the Uber board of directors could have fairly considered the demand, and dismissed the complaint. The plaintiff has appealed the Court of Chancery's decision.

By any reasonable measure, the Uber board of directors approved a flawed transaction. But we, like the Court of Chancery, do not decide the merits of the claims at this stage of the proceedings. Instead, we consider the gating issue of the demand requirement in a derivative action. Under Delaware law, the board of directors manage the business and affairs of the corporation. That responsibility normally includes deciding whether to bring litigation on the corporation's behalf. When the board is disabled from making the decision, however—whether because of interestedness or lacking independence from those who are interested—a stockholder can control the litigation decision.

We find, as did the Court of Chancery, that a majority of the board was disinterested because it had no real threat of personal liability due to Uber's exculpatory charter provision. And a majority of the board was also independent of the one interested director. Thus, the board, and not the plaintiff, controlled the decision whether to bring litigation on Uber's behalf, which meant the plaintiff had to make a demand on the board that Uber bring the litigation. He did not. The Court of Chancery's judgment dismissing the complaint with prejudice is affirmed.

I.

According to the allegations of the complaint, Uber operates a leading "ride share" mobile application.[1]  In 2015, Travis Kalanick, Uber's founder, feared Uber was falling behind in the race to develop an autonomous vehicle—an "existential" threat to the company.[2]  To regain lost ground, in June 2015 Uber recruited Anthony Levandowski, then the Engineering Manager of Google's autonomous vehicle project, to leave Google and join Uber.[3]  Kalanick communicated extensively with Levandowski.  They developed an "extremely close" relationship.[4]

On January 15, 2016, Levandowski founded Otto while still employed by Google.[5]  At the end of January, Levandowski left Google and hired over a dozen former Google employees at Otto.  Weeks later, Uber and Otto signed a term sheet for Uber to acquire Otto.[6]  According to the plaintiff, Otto had no real operations and

---

[1] At this stage of the proceedings, we accept as true the complaint's well-pleaded allegations and also rely on documents referred to or incorporated by reference. *See Marchand v. Barnhill*, 212 A.3d 805, 809 n.13 (Del. 2019).  The complaint incorporated Uber's charter, the Stroz Friedberg final report, a redacted version of the Merger Agreement between Uber and Otto, a redacted version of the indemnification agreement between Uber and Otto that accompanied the Merger Agreement, a redacted version of a slide deck used in Uber management's presentation to the board on the Otto acquisition, and part of Uber director William Gurley's testimony in another litigation that the plaintiff quoted in the complaint. *McElrath on behalf of Uber Techs., Inc. v. Kalanick*, 2019 WL 1430210, at *2 n.2 (Del. Ch. Apr. 1, 2019).
[2] App. to Opening Br. at A172-73 (Verified Amended Stockholder Derivative Complaint 12-13 ¶ 37 (hereinafter "Am. Compl.")).
[3] *Id.* at A172–73 (Am. Compl. 12-13 ¶¶ 35, 39).
[4] *Id.* at A174 (Am. Compl. 14 ¶ 40).
[5] *Id.* at A175 (Am. Compl. 15 ¶ 44).
[6] *Id.* at A176 (Am. Compl. 16 ¶ 46).

was run from Levandowski's house.[7] Kalanick testified in another proceeding that the acquisition was "basically [] hiring [Levandowski] and his team."[8]

After signing the term sheet, Uber and its outside counsel hired Stroz Friedberg, LLC, a computer forensic investigation firm, to conduct an independent investigation into whether Otto employees took with them Google's proprietary information or might breach non-solicitation, non-compete, or fiduciary obligations if they moved from Google to Otto.[9] The board was aware that Stroz had been hired to conduct an investigation.[10]

In early April, Stroz delivered its preliminary report to Uber's outside counsel, Uber's general counsel, and Otto's counsel. The complaint contained little detail about the contents of the report, except a finding that some Otto employees "possessed substantial files containing confidential and proprietary Google information, and surreptitiously tried to delete more on the eve of the Stroz interviews."[11] Uber's general counsel knew of the preliminary findings by April 10, 2016, and, as alleged, expressed "serious reservations" to Kalanick about the Otto acquisition, but did not otherwise inform the board.[12]

---

[7] *Id.* at A176 (Am. Compl. 16 ¶ 47).
[8] *Id.*
[9] *Id*. at A177 (Am. Compl. 17 ¶ 49), A163 (Am. Compl. 3 ¶ 5).
[10] *Id.* at A177 (Am. Compl. 17 ¶ 50).
[11] *Id.* at A179 (Am. Compl. 19 ¶ 55).
[12] *Id.* at A178–79 (Am. Compl. 18-19 ¶ 53).

On April 11, 2016, the board—then composed of Kalanick, Garrett Camp, Ryan Graves, William Gurley, and David Bonderman—met to approve the acquisition. When Kalanick presented the transaction to the board, according to the plaintiff, Kalanick "failed to present the preliminary findings of the Stroz investigators."[13] Also, as alleged, none of the other directors asked to see the report.[14] Otherwise, the record reflects that diligence was discussed and represented to be "okay."[15]

The board also discussed what the plaintiff characterizes as atypical indemnification provisions of the merger agreement that "were clearly explained in the presentations to the [b]oard regarding the transaction."[16] Otto would not indemnify Uber post-closing for Otto's breaches of representations and warranties.[17] Also, certain Otto employees, including Levandowski, would have limited indemnification rights for pre-signing misconduct disclosed during the Stroz

---

[13] *Id.* at A179 (Am. Compl. 19 ¶ 54).

[14] *Id.*

[15] *McElrath*, 2019 WL 1430210, at *11. The Court of Chancery found that the complaint incorporated Gurley's testimony in another suit where Gurley testified that there was "discussion about the due diligence that had been done. And we as a group made a decision that we're going to move forward because the due diligence was okay." *Id.* at *4; App. to Opening Br. at A159. While the plaintiff argues this was not expressly alleged in his complaint, he does not challenge the incorporation of the relevant Gurley testimony.

[16] App. to Opening Br. at A187 (Am. Compl. 27 ¶ 78).

[17] *Id.* at A182 (Am. Compl. 22 ¶ 62) ("[T]he Merger Agreement contains customary representations regarding Otto's ownership of IP, but it omits any post-closing indemnification remedy for Uber. Contrary to what is customary, Uber is not indemnified for breaches of representations and warranties nor is it indemnified for any species of third party claims.").

investigation, but not for undisclosed pre-signing or any post-signing misconduct.[18] After discussion, the board approved the transaction.

On August 5, 2016, Stroz delivered its final report, which described how some Otto employees had retained, accessed, or deleted confidential Google information on their personal devices after their departure from Google. The plaintiff did not, however, allege that the report found any Google confidential information transferred to Otto or Uber.[19] And while the plaintiff relied on a list of findings in the final Stroz report, it is unclear whether they differ from the preliminary report.[20] Also, the plaintiff does not allege that the directors knew that the final report differed from the preliminary report.

The board—having added Arianna Huffington and Yasir Al-Rumayyan—met before closing the transaction. The directors discussed the risk of Google suing, the critical nature of the diligence, and the details of the indemnification provision.[21]

---

[18] *Id.* at A183-84 (Am. Compl. 23–24 ¶ 65).

[19] *Id.* at A130 (According to the report, "[w]hile Levandowski retained, and in some cases, accessed Google confidential information after his departure from Google, Stroz Friedberg discovered no evidence indicating that he transferred any of that data to Ottomotto or other third parties.").

[20] *Compare id.* at A179 (Am. Compl. 19 ¶ 55) (describing the preliminary findings that "Levandowski and others at Otto possessed substantial files containing confidential and proprietary Google information, and surreptitiously tried to delete more on the eve of the . . . interview"), *with id.* at A185–86 (Am. Compl. 25–26 ¶¶ 70–73) (describing the final report's findings that Otto employees possessed confidential files and Levandowski attempted to delete files before and during his interview).

[21] *Id.* at A186–87 (Am. Compl. 26–27 ¶¶ 75, 78).

The plaintiff alleges they did not, however, specifically read or inquire about the Stroz report.[22]

After the transaction closed, in December 2016, Google mistakenly received an email intended for Uber from one of its vendors. The email contained drawings of a circuit board for autonomous vehicle technology that allegedly resembled Google's internal engineering drawings. Google sued Uber and Otto in February 2017 for misappropriation of proprietary information. Uber eventually settled the lawsuit by issuing additional Uber stock to Google valued at $245 million.[23] Uber also terminated Levandowski's employment.[24]

After Uber announced the settlement, the plaintiff filed this derivative suit against the directors who decided to proceed with the Otto transaction, the directors who decided to close the transaction, and two Uber officers.[25] According to the plaintiff, making a demand on the Uber board before filing suit was futile because a majority of the Uber directors at the time he filed his complaint—Kalanick, Graves, Camp, Huffington, Al-Rumayyan, Matt Cohler, David Trujillo, Ursula Burns, and John Thain—were interested or not independent of those who were interested.[26]

---

[22] *Id.* at A179–80 (Am. Compl. 19–20 ¶ 56); Opening Br. at 37.
[23] According to Uber, Google "already owned Uber shares." Uber's Answering Br. at 14.
[24] App. to Opening Br. at A192 (Am. Compl. 32 ¶ 94).
[25] *Id.* at A161.
[26] Wan Ling Martello and Dara Khosrowshahi were also on the Uber board at the time the plaintiff filed his complaint, but he does not contest their disinterestedness or independence. *Id.* at A194 (Am. Compl. 34 ¶ 104).

Uber and the individual defendants moved to dismiss for failure to make a demand under Court of Chancery Rule 23.1. They argued that the Uber board could have fairly considered whether to pursue the litigation brought by the plaintiff. The Court of Chancery found that Kalanick was the only interested director, and a majority of the board was independent from him at the time of the complaint. Thus, Rule 23.1 required the plaintiff to demand the board pursue litigation on Uber's behalf. Because the plaintiff did not, the Court of Chancery dismissed the complaint.

## II.

We review *de novo* the Court of Chancery's decision to dismiss the complaint.[27] At this stage, we must accept as true any "particularized allegations of fact."[28] And while we must draw all reasonable inferences in the plaintiff's favor, we do not draw unreasonable inferences.[29] Under Rule 23.1, the plaintiff has "a heightened burden to plead particularized facts establishing a 'reasonable doubt that . . . the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand.'"[30]

---

[27] *Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000) ("We . . . decide *de novo* whether the Complaint was properly dismissed for failure to set forth particularized facts to support the plaintiffs' claim that demand is excused.").

[28] *City of Birmingham Ret. and Relief Sys. v. Good*, 177 A.3d 47, 55–56 (Del. 2017).

[29] *Id.* at 56.

[30] *Id*. (quoting *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993)).

A.

Under Delaware law, the board of directors manages the business and affairs of the corporation, which includes deciding whether the corporation should pursue litigation against others.[31] To protect the directors' managerial authority, a stockholder must comply with Court of Chancery Rule 23.1 before pursuing derivative litigation.[32] A stockholder must first make a demand on the board to pursue the claim, and, if the board declines, "attempt to demonstrate that the directors wrongfully refused the demand."[33] The demand requirement affords "the corporation the opportunity to address an alleged wrong without litigation and to control any litigation which does occur."[34] Further, it "insure[s] [sic] that a stockholder exhausts his intracorporate remedies" and "safeguard[s] against strike suits."[35]

A stockholder can bypass the demand requirement if he "can allege with sufficient particularity that demand is futile and should be excused due to a disabling

---

[31] *Id.* at 54; *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984) (citing 8 *Del. C.* § 141(a)) *overruled on other grounds by Brehm*, 746 A.2d at 253.

[32] Ct. Ch. R. 23.1(a).

[33] *City of Birmingham Ret. and Relief Sys.*, 177 A.3d at 55; *see* Ct. Ch. R. 23.1(a).

[34] *Kaplan v. Peat, Marwick, Mitchell & Co.*, 540 A.2d 726, 730 (Del. 1988).

[35] *Aronson*, 473 A.2d at 811–12; *see Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1050 (Del. 2004) (finding that a purpose of the demand requirement is to deter suits "where there is only a suspicion expressed solely in conclusory terms") (quoting *Grimes v. Donald*, 673 A.2d 1207, 1217 (Del. 1996)).

conflict by a majority of the directors to consider the demand."[36] The demand futility test is highly dependent on the particularity of the facts alleged in the complaint.[37] When a majority of directors at the time of the challenged conduct have been replaced, the demand futility test articulated in *Rales v. Blasband* applies.[38] The *Rales* test considers "whether the board that would be addressing the demand can impartially consider its merits without being influenced by improper considerations."[39] The plaintiff satisfies the demand futility pleading requirements under *Rales* if his allegations "create a reasonable doubt that . . . the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand."[40]

First, the court must consider whether any directors were interested. A director is interested if, in this instance, she would face a substantial likelihood of personal liability for the conduct alleged in the complaint.[41] Second, if any directors were interested, the court considers whether any other directors were not

---

[36] *City of Birmingham Ret. and Relief Sys.*, 177 A.3d at 55.
[37] *See Rales*, 634 A.2d at 933-34.
[38] *Id.* The Court of Chancery applied the *Rales* test. *McElrath*, 2019 WL 1430210, at *8. The parties do not dispute its application.
[39] *Rales*, 634 A.2d at 934.
[40] *Id.*
[41] *City of Birmingham Ret. and Relief Sys.*, 177 A.3d at 55; *Wood v. Baum*, 953 A.2d 136, 140–41 (Del. 2008). A director can be interested for other reasons, which are not alleged here. *See Rales*, 634 A.2d at 936 (Director interest can be shown when "he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders" or "where a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders.").

independent of an interested director. Independence turns on whether "the director's ability to act impartially on a matter important to the interested party can be doubted because that director may feel either subject to the interested party's dominion or beholden to that interested party."[42] After tallying the results, if a majority of the board in place when the complaint was filed was disinterested and independent, the stockholder must first make a demand on the board before pursuing litigation on the corporation's behalf.

B.

Examining first the Uber directors the plaintiff alleges were interested because of the substantial likelihood of personal liability for wrongdoing, Uber's Certificate of Incorporation exculpates its directors from monetary liability for fiduciary duty breaches to the fullest extent permitted by the Delaware General Corporation Law.[43] Given this protection from due care violations, the plaintiff must plead with particularity that the directors "acted with scienter, meaning 'they had actual or constructive knowledge that their conduct was legally improper.'"[44] In other words, directors are liable for "subjective bad faith" when their conduct is motivated "by an actual intent to do harm," or when there is an "intentional dereliction of duty, a

---

[42] *Marchand*, 212 A.3d at 818 (citing *Sandys v. Pincus*, 152 A.2d 124, 128 (Del. 2016) (quoting *Del. Cty. Emps. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1024 n.25 (Del. 2015))).
[43] *McElrath*, 2019 WL 1430210, at *9.
[44] *City of Birmingham Ret. and Relief Sys.*, 177 A.3d at 55 (quoting *Wood*, 953 A.2d at 141 (internal quotations omitted)).

13

conscious disregard for one's responsibilities."[45]   Pleading bad faith is a difficult task and requires "that a director acted inconsistent with his fiduciary duties and, most importantly, that the director *knew* he was so acting."[46]   Gross negligence, without more, is insufficient to get out from under an exculpated breach of the duty of care.[47]

Of the eleven directors on the board when the plaintiff filed his complaint, the plaintiff alleges that five were interested because they faced a substantial likelihood of liability for approving and closing the deal—Kalanick, Camp, Graves, Huffington, and Al-Rumayyan.[48]   While the defendants claim they dispute the Court of Chancery's finding that Kalanick was interested,[49] they make no serious argument

---

[45] *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 64, 66 (Del. 2006); *see Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 243 (Del. 2009) ("[T]here is a vast difference between an inadequate or flawed effort to carry out fiduciary duties and a conscious disregard for those duties.").

[46] *City of Birmingham Ret. and Relief Sys.*, 177 A.3d at 55 (quoting *In re Massey Energy Co.*, 2011 WL 2176479, at *22 (Del. Ch. May 31, 2011) (emphasis in original)); *see id.* ("Because of the difficulties in proving bad faith director action, a *Caremark* claim is 'possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment.'") (citing *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996)).

[47] *In re Walt Disney Co. Derivative Litig.*, 906 A.2d at 65.

[48] App. to Opening Br. at A199 (Am. Compl. 39 ¶ 113).  Kalanick, Camp, Graves, Gurley, and Bonderman were the entire board that approved the Otto transaction.  *Id.* at A167-68 (Am. Compl. 7–8 ¶¶ 18–24).  Huffington and Al-Rumayyan joined the board after the transaction's approval, but before closing.  *Id.*  While Gurley and Bonderman were not directors at the time the plaintiff filed his complaint, his allegation that Trujillo and Cohler were conflicted relies, in part, on finding that Gurley and Bonderman faced a substantial likelihood of liability for approving and closing the deal.

[49] Uber's Answering Br. at 19 n.3; Kalanick's Joinder in Answering Br. at 2.

on appeal to challenge the finding. Thus, we start from the Court of Chancery's finding that Kalanick was interested and unable to fairly consider a demand.[50]

The plaintiff challenges the Court of Chancery's finding that the directors did not act in bad faith when approving the Otto transaction.[51] First, the plaintiff argues that, because Kalanick as CEO was the one who brought the transaction to the board and was involved with diligence, the directors should have been wise enough not to rely on someone with a reputation as a law breaker. In support, the plaintiff points to one of Kalanick's prior businesses, Scour, which offered music and film releases. Scour was eventually shut down for copyright violations and sued for $250 billion. Further, the plaintiff alleges that Uber had a practice of hiring employees from competitors to steal trade secrets and a general practice of ignoring and violating regulations.[52] When these allegations are combined, the plaintiff argues that the board was on notice that Kalanick might be ignoring intellectual property laws in the Otto acquisition.

---

[50] *McElrath*, 2019 WL 1430210, at *10; *Sullivan v. Mayor of Town of Elsmere*, 23 A.3d 128, 134 (Del. 2011) (finding that a trial court's determination became the "law of this case" when the party did not challenge that determination in a cross-appeal); *see also Greenlaw v. United States*, 554 U.S. 237, 244 (2008) ("Under [the cross-appeal rule,] an appellate court may not alter a judgment to benefit a nonappealing party.").

[51] Because Kalanick was interested, we will refer to the directors as those directors other than Kalanick.

[52] The plaintiff also alleges other reasons to doubt Kalanick's reliability, including Uber's "internal espionage market analytics team," Kalanick's public disdain for the law, Uber's "Greyball" operation, and the lawsuits and criminal probes against Uber. Opening Br. at 24–25.

Second, the plaintiff argues that the allegedly unusual indemnification clauses in the merger agreement put the board on notice that Kalanick wanted to steal Google's proprietary information. The agreement indemnified certain Otto employees for pre-signing misconduct disclosed during the Stroz investigation, but prevented Uber from seeking indemnification from Levandowski for violating non-compete and infringement claims. And, as the plaintiff alleged, Uber hired Stroz to investigate whether Otto employees stole Google's intellectual property, but the board approved the transaction without personally reviewing the preliminary or final Stroz reports. The plaintiff argues that, viewed holistically, these facts entitle him "to a reasonable inference that the [b]oard's failure to inquire or inform themselves about the scope of potential legal and financial risk faced by Uber in connection with the [Otto] [t]ransaction amounts to bad faith."[53]

We agree, however, with the Court of Chancery that the plaintiff did not meet his particularized burden of alleging that the board in place when the plaintiff filed his complaint, besides Kalanick, acted in bad faith. As noted before, a showing of bad faith in the context of demand excusal is a high hurdle, and essentially requires the plaintiff to demonstrate intentional wrongdoing by the board. The complaint alleges, however, that Uber's directors heard a presentation that summarized the

---

[53] *Id*. at 28.

transaction, reviewed the risk of litigation with Google, generally discussed due diligence, asked questions, and participated in a discussion.[54] The inference from these allegations shows a functioning board that did more than rubberstamp the transaction presented by Uber's CEO.

Further, Kalanick might have a background that would lead a reasonable board member to dig deeper into representations he made about the transaction. But, as the Court of Chancery found, there were no allegations that Kalanick had a history of lying to the board.[55] And the record supports the conclusion that the diligence presented to the board was, in fact, "okay."[56] The complaint's allegations do not lead to a reasonable inference that the board intentionally ignored the risks of the transaction.[57] On the contrary, it appears that the directors considered the risks and nonetheless proceeded with the transaction. As we have noted before, "there is a vast difference between an inadequate or flawed effort to carry out fiduciary duties and a conscious disregard for those duties."[58] It is not enough to allege that the

---

[54] App. to Opening Br. at A183 (Am. Compl. 23 ¶ 63), A186 (Am. Compl. 26 ¶ 75), A187 (Am. Compl. 27 ¶ 78); Opening Br. at 28 ("The [b]oard knew about these unusual provisions . . . and specifically discussed the possibility of being sued by Google, yet it still approved the [Otto] [t]ransaction . . . .").

[55] *McElrath*, 2019 WL 1430210, at *15 n.173.

[56] App. to Opening Br. at A159; *see McElrath*, 2019 WL 1430210, at *4, *11.

[57] 8 *Del. C.* § 141(e) (The board "shall . . . be fully protected in relying in good faith upon the . . . information, opinions, reports or statements presented" by the corporation's officers.).

[58] *Lyondell Chem. Co.*, 970 A.2d at 243.

directors should have been better informed—a due care violation exculpated by the corporation's charter provision.[59]

Turning to the indemnification provisions, while unusual, those provisions were "clearly explained to the board" and did provide some protection for Uber—Uber would not have to indemnify Levandowski and others for conduct that was not disclosed to Uber before closing.[60] The Court of Chancery concluded correctly that the allegations as pleaded did not support a reasonable inference that the directors knew the transaction was nothing more than a vehicle to steal Google's proprietary information.[61] Instead, the reasonable inference is the board should have done more, not that it acted in bad faith. Thus, we agree with the Court of Chancery that the unusual indemnification provisions approved by the board do not lead to any inference other than the board approved a flawed transaction.

The plaintiff attempts to analogize the allegations here to *In re Walt Disney Co. Derivative Litigation*, where the Court of Chancery found that "the facts alleged . . . suggest that the defendant directors consciously and intentionally disregarded their responsibilities . . ." and the plaintiff sufficiently pleaded bad faith.[62] In *Disney*,

---

[59] *Id.* at 243–44 ("[I]f the directors failed to do all that they should have under the circumstances, they breached their duty of care. Only if they knowingly and completely failed to undertake their responsibilities would they breach their duty of loyalty.").

[60] App. to Opening Br. at A183-84 (Am. Compl. 23–24 ¶ 65), A187 (Am. Compl. 27 ¶ 78).

[61] *McElrath*, 2019 WL 1430210, at *15.

[62] 825 A.2d 275, 289 (Del. Ch. 2003) (emphasis omitted).

the board approved a high profile hiring decision before the details were negotiated and assigned the responsibility to the CEO to negotiate the employment contract with the new hire who was his friend of many years.[63] The court explained:

> Less than one and one-half pages of the fifteen pages of Old Board minutes were devoted to discussions of Ovitz's hiring as Disney's new president. . . . No presentations were made to the Old Board regarding the terms of the draft agreement. No questions were raised, at least so far as the minutes reflect. At the end of the meeting, the Old Board authorized Ovitz's hiring as Disney's president. No further review or approval of the employment agreement occurred. Throughout both meetings, no expert consultant was present to advise the compensation committee or the Old Board. Notably, the Old Board approved Ovitz's hiring even though the employment agreement was still a "work in progress." The Old Board simply passed off the details to Ovitz and his good friend, Eisner.[64]

Here, like the Court of Chancery, we find the *Disney* allegations different. Unlike *Disney*, where the directors devoted very little time, had no presentations, and asked no questions, the Uber board met to consider the Otto acquisition. Outside counsel and an investigative firm assisted with due diligence. Kalanick made a presentation, and the board discussed the terms of the deal and its risks. Although there might have been reason to dig deeper into Kalanick's representations about the transaction, the board's failure to investigate further cannot be characterized fairly as an "intentional dereliction" of its responsibilities.

---

[63] *Id.* at 279–81.
[64] *Id*. at 287.

19

The plaintiff also argues that the directors who decided to close the deal acted in bad faith because they should have reviewed the final Stroz report before allowing the transaction to close. Besides relying on the same argument that approving the transaction was done in bad faith, the plaintiff argues only that the final Stroz report showed that Uber could have terminated the deal because Otto breached a representation.[65] But the plaintiff did not allege that the directors were informed of any change or had any additional reasons to doubt the diligence process since the approval decision. Like the approval decision, Uber's directors heard a presentation that summarized the transaction, reviewed the risk of litigation with Google, generally discussed due diligence, asked questions, and participated in a discussion.[66] We agree with the Court of Chancery that the plaintiff has "not sufficiently [pleaded] that the directors knew [intellectual property] misappropriation was not [] simply a risk, but was actually Kalanick's goal, and that, in light of that knowledge, the directors closed their eyes to evidence of IP misappropriation by refusing to look at Stroz' final report." [67]

---

[65] Opening Br. at 36. The defendants dispute whether there was a breach. Answering Br. at 33–34.

[66] App. to Opening Br. at A186-87 (Am. Compl. 26–27 ¶¶ 75, 78).

[67] *McElrath*, 2019 WL 1430210, at *16. The plaintiff also briefly raises his waste claim. Opening Br. at 31. But because this claim requires finding waste on the same facts that we do not find bad faith, we also find it to be without merit.

## C.

Having found only one interested director, Kalanick, we turn to the allegations that a majority of directors were not independent of Kalanick. Because Uber's board consisted of eleven directors when the plaintiff filed his complaint, dismissal depends on whether we find that at least six directors were independent of Kalanick. The plaintiff does not challenge the independence of three directors—Martello, Khosrowshahi, and Al-Rumayyan. And he does not challenge Cohler's or Trujillo's independence from Kalanick.[68] Thus, if one additional director was independent of Kalanick, the plaintiff failed to plead demand futility.

A director's independence turns on "whether the plaintiffs have [pleaded] facts from which the director's ability to act impartially on a matter important to the interested party can be doubted because that director may feel either subject to the interested party's dominion or beholden to that interested party."[69] We must consider the full context of "all the [pleaded] facts regarding a director's relationship to the interested party,"[70] and decide whether the relationship is "of a bias-producing nature."[71] Importantly, being nominated or elected by a director who controls the

---

[68] The plaintiff challenged Cohler's and Trujillo's independence from their predecessor directors who were also partners of their respective investment firms. But, like the Court of Chancery, we need not decide whether Cohler and Trujillo were independent from their predecessors because we find that their predecessors were not interested.

[69] *Sandys*, 152 A.3d at 128 (quoting *Sanchez*, 124 A.3d at 1024 n.25).

[70] *Sanchez*, 124 A.3d at 1022.

[71] *Beam*, 845 A.2d at 1050.

outcome is insufficient by itself to reasonably doubt a director's independence because "[t]hat is the usual way a person becomes a corporate director."[72]

The plaintiff challenged Thain's independence because Kalanick appointed Thain "during a power struggle within Uber" after the board ousted Kalanick as CEO and an investor had sued Kalanick for fraud.[73] The Court of Chancery found that Thain was independent because the plaintiff does not allege that Thain had a personal or financial connection to Kalanick or that the directorship was of substantial material importance to him.[74]

We agree with those determinations. The plaintiff challenged Thain's independence, in part, because Kalanick had the ability to appoint and remove him. Otherwise, the plaintiff relied only on the circumstances surrounding Thain's appointment and the allegation that Kalanick sought to use Thain as a means of retaining control. But appointment to the board is an insufficient basis for challenging Thain's independence.[75] And the context of Thain's appointment—that

---

[72] *Aronson*, 473 A.2d at 816; *see Beam*, 845 A.2d at 1052 ("To create a reasonable doubt about an outside director's independence, a plaintiff must plead facts that would support the inference that because of the nature of a relationship or additional circumstances other than the interested director's stock ownership or voting power, the non-interested director would be more willing to risk his or her reputation than risk the relationship with the interested director.").

[73] App. to Opening Br. at A202 (Am. Compl. 42 ¶ 117).

[74] *McElrath*, 2019 WL 1430210, at *19.

[75] *See also Blaustein v. Lord Baltimore Capital Corp.*, 84 A.3d 954, 958–59 (Del. 2014) (finding that allegations that a director was appointed by a party and voted with the party in the past were insufficient, without more, to demonstrate a lack of independence).

Kalanick appointed him in a power struggle and that Thain might be loyal to him—without more does not allow a reasonable inference that Thain and Kalanick's relationship was of a "bias-producing nature."[76]  Otherwise, a director would be automatically disqualified if appointed during a board conflict.  We agree with the Court of Chancery that Thain was independent of Kalanick.[77]

## III.

We stop here because we find that six directors—a majority of the board at the time the plaintiff filed the complaint—were disinterested and independent.  Thus, the plaintiff was required to demand that the board pursue the claim.  Because the plaintiff did not make a demand before filing suit, we affirm the Court of Chancery's decision to dismiss the complaint.

---

[76] *See Beam*, 845 A.2d at 1050.

[77] The plaintiff also alleged comments by the successor CEO that characterized Kalanick's appointments as "disappointing news" and "highly unusual," and that a "corporate governance expert said that [Thain] 'seem[s] to be walking in the door with a button that says Team Travis, instead of Team Shareholder.'"  App. to Opening Br. at A203 (Am. Compl. 43 ¶ 118).  Hearsay and hyperbole, however, are no substitute for pleading particularized facts to meet the plaintiff's heightened pleading burden.